STATE OF CONNECTICUT *v.* REGINALD ·RIDLEY
(2811)

HULL, SPALLONE and BIELUCH, Js.

Argued April 2—decision released May 27, 1986

*Robert F. McWeeny,* with whom, on the brief, was *Helen Apostolidis,* for the appellant (defendant).

*Robert J. Murphy,* special deputy assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Julia DiCocco Dewey,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant, Reginald Ridley, is appealing from the judgment rendered after his conviction by a jury of the crime of attempted robbery in the first degree in violation of General Statutes §§ 53a-8, 53a-49 and 53a-134 (a) (4). He claims that the trial court erred (1) in refusing to charge the jury as requested with regard to identification testimony, (2) in refusing to grant a mistrial after the prosecution remarked during closing argument that the defendant failed to call an alibi witness, (3) in denying the defendant's motion to equalize the number of peremptory challenges, (4) in denying the defendant's motion to suppress the in-court identification, and (5) in denying the defendant's motion for an opening statement.

We will discuss the defendant's third and fifth claims of error first, as they deal with the court's rulings on procedural matters. This was a joint trial of two defendants. The trial court, in accordance with General Statutes §§ 54-82g and 54-82h, allotted each of the defendants eight peremptory challenges for a total of sixteen and allotted sixteen peremptory challenges to the state, thereby construing the statutes as allowing the state a number of challenges equal to the total collectively allowed to the defendants. The pertinent language in § 54-82g states that "[t]he state, on the trial

of any criminal prosecution, may challenge peremptorily the same number of jurors as the accused." Section 54-82h provides in pertinent part that "[i]n any criminal prosecution the state and the accused may each peremptorily challenge . . . eight jurors if the offense is punishable by imprisonment for more than one year and for less than life . . . ."[1] The court's interpretation is reasonable and in accordance with the construction of similar statutes in other jurisdictions where courts have held that such statutes have been construed to allow the prosecution the same number of challenges as that collectively allotted to the defendants. See *Spies* v. *People,* 122 Ill. 1, 264–65, 12 N.E. 865 (1887); *State* v. *Noakes,* 70 Vt. 247, 253–54, 40 A. 249 (1897). Even if the court erred, however, we have no way of knowing what prejudice, if any, befell the defendant because the parties excused the court reporter during jury selection thereby vaulting any showing of prejudice to the defendant into the area of speculation. This action, acquiesced in by the defendant, effectively precludes us from any review. It is the appellant's burden to present us with an adequate record for review. *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.,* 194 Conn. 400, 407, 480 A.2d 552 (1984); see Practice Book § 3060V.

The defendant's fifth claim of error is equally without merit. In this state, we have not established by statute, rule or practice a procedure which allows the defendant, in a criminal case, to make an opening statement to the jury. Nor has the right to make an opening statement been construed as one of constitutional proportions. " 'The Constitution requires no more than that trials be fairly conducted and that guaranteed rights of defendants be scrupulously respected.' . . . We

---

[1] The crimes for which the two defendants were tried fall into this category.

believe that an opening statement by the defendant is not such a guaranteed right, and that the making and timing of opening statements can be left constitutionally to the informed discretion of the trial judge." (Citations omitted.) *United States* v. *Salovitz,* 701 F.2d 17, 21 (2d. Cir. 1983); see *United States* v. *Zielie,* 734 F.2d 1447, 1454–55 (11th Cir. 1984).

We agree with the proposition set forth in these cases and hold that, in our jurisdiction, the right to make an opening statement to the jury by a defendant in a criminal case is not guaranteed by law or rule. Whether to allow an opening statement is a decision to be left to the sound discretion of the trial court, taking into consideration the number and nature of the charges, the complexity of the issues, the number of defendants and their interrelationship, and similar factors which, when put into proper perspective by an opening statement, would serve to clarify the issues and focus the attention of the jury upon the matters it must decide.[2]

The defendant's remaining claims of error require us to examine the facts of this case which the jury could reasonably have found to be as follows. On October 30, 1981, Detective James Harris, a West Haven police officer, was assigned to maintain crowd control during a high school football game at Quigley Stadium. At approximately 9 p.m., while investigating a complaint of suspicious activity occurring in the parking area on the Front Avenue side of the stadium, Harris observed three black males loitering in the parking area. Upon seeing Harris, the group disbursed toward Front Ave-

---

[2] In civil trials, "[i]nstead of reading the pleadings, counsel for any party shall be permitted to make a brief opening statement to the jury in jury cases, or in a court case at the discretion of the presiding judge, to apprise the trier in general terms as to the nature of the case being presented for trial. The presiding judge shall have discretion as to the latitude of the statements of counsel." Practice Book § 296.

nue. One of the males, subsequently identified as the defendant, was approximately twenty feet from the officer. Harris described the defendant as being approximately eighteen years old, five feet nine inches tall, wearing a gray or light blue ski jacket, with red, white and blue stripes along the back. He described the second male as being approximately eighteen years old, between six feet and six feet two inches tall, wearing a bronze colored ski jacket and white ski goggles with green lenses. He described the third male as wearing dark clothing, but as being otherwise indistinguishable.

That same evening, at approximately the same hour, Dean McKissick and Diane Arute, after parking their vehicle, were walking along Front Avenue towards the stadium to attend a football game when they were approached by three black males. One male, subsequently identified as Lafayette Ridley, seized McKissick while another unidentified male seized Arute. The third male, subsequently identified as the defendant, standing apart from the other assailants, drew a .32 caliber revolver from his jacket and said, "This is a stick-up." McKissick resisted the robbery attempt and a fight ensued. Arute broke free and hailed a passing motorist who stopped and let Arute into the car. The three assailants fled and McKissick joined Arute in the vehicle. McKissick and Arute were driven to the parking area and immediately reported the incident to Harris. The incident lasted approximately seven to ten minutes and occurred in a lighted area.

Arute identified the black male who held the revolver as being sixteen to seventeen years old, five feet nine inches in height, with a short afro hair style, flat nose, full lips and wearing a dark colored ski jacket. She observed that another male, subsequently identified as Lafayette Ridley, was wearing light colored ski glasses and was approximately the same age as the defendant, but three to four inches taller.

McKissick in his description of the black male holding the revolver stated that he was approximately five feet eight inches tall with a short afro haircut and a flat nose, sixteen or seventeen years old and wearing a dark blue ski jacket. He also stated that the male who initially seized him during the attempted robbery was five feet ten or eleven inches tall and was wearing white ski goggles with green tinted lenses and a ski jacket lighter than that worn by the man holding the revolver.

On November 5, 1981, McKissick and Arute were called to the West Haven police department where they viewed three photographic arrays. Each array contained nine photographs of black males. McKissick identified a photograph of Lafayette Ridley as the assailant who initially seized him during the attempted robbery. Arute selected two photographs which she indicated resembled the individual who held the revolver during the incident. One of the photographs she selected was that of the defendant. On the following day, Detective Harris examined the same arrays and identified a photograph of the defendant as the individual he encountered in the Quigley Stadium parking lot prior to his investigation of the attempted robbery.

At the trial, both Arute and Harris positively identified the defendant as an individual whom they encountered on the night of the attempted robbery. The defendant's motion to suppress the in-court identification by Arute, based on suggestive procedure, was denied.

The defendant testified on his own behalf and denied that he had participated in the attempted robbery, stating that, at the time of the incident, he was with his former girlfriend, Pearl Smith. He also testified that, at the time of the trial, Pearl Smith was residing in the state of New Jersey. During closing argument, the prosecutor stated to the jury that the defendant "could

have called" his former girlfriend as a witness. Defense counsel timely objected to this remark and, out of the presence of the jury, moved for a mistrial. The trial court denied the motion, but upon the defendant's request, immediately directed the jury to ignore the remark and "give it no consideration at all." Prior to the court's charge to the jury, the defendant submitted a written request to charge on identification testimony, which was denied by the court.

In the defendant's first claim of error, he takes issue with the court's refusal to caution the jury, as he requested, of the dangers inherent in eyewitness identification testimony. The substance of the requested charge was that: identification testimony should be received with caution in that mistaken identification is not uncommon; the danger of suggestion is possible and that it is a matter of common knowledge; once a witness identified an individual, he is unlikely to change his testimony; and individuals belonging to one race have difficulty identifying individuals of another race. The requested charge also included a recitation of the reliability factors set forth in *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Id., 199–200.

Our Supreme Court has recognized that in appropriate identification cases it is preferable that the jury be charged regarding the dangers of misidentification. Whether the failure to make such an instruction would constitute reversible error, however, depends upon the circumstances of each case. *State* v. *Tinsley,* 181 Conn. 388, 394, 435 A.2d 1002 (1980), cert. denied, 449 U.S.

1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981); see *United States* v. *Fernandez*, 456 F.2d 638, 642 (2d Cir. 1972). Ultimately, a trial court's instructions must present the case to the jury fairly and adequately. *State* v. *Tinsley*, supra, 394; *State* v. *Harden*, 175 Conn. 315, 321–22, 398 A.2d 1169 (1978).

The factual circumstances here support the conclusion that the instructions presented this case adequately to the jury for a fair resolution of the issues. The eyewitness, Arute, was positive in her identification of the defendant as the holder of the revolver during the incident. She had the opportunity to observe the assailants for a period of between five and seven minutes, in an area which was illuminated by street lights. Moreover, her description of the defendant given immediately after the incident was confirmed in significant respects by her fellow victim, McKissick. Harris, who had observed the defendant from a distance of twenty feet just prior to the attempted robbery, was also positive in his in-court identification of the defendant. Harris' corroborative testimony provides a sufficient basis to support the court's refusal to grant the defendant's requested charge on identification.

Furthermore, counsel for the defendant, focusing on the reliability factors enunciated in *Neil* v. *Biggers*, supra, 199–200, thoroughly cross-examined Arute on her ability to observe the defendant under the conditions which prevailed at the time of the incident. It is well recognized that extensive cross-examination of an eyewitness will obviate the need for specific cautionary instructions on the reliability of such identifications. See *United States* v. *Montelbano*, 605 F.2d 56, 59 (2d Cir. 1979); *United States* v. *Marchand*, 564 F.2d 983, 997 (2d Cir. 1977), cert. denied, 434 U.S. 1015, 98 S. Ct. 732, 54 L. Ed. 2d 760 (1978).

Our analysis of the instructions the court gave to the jury with respect to identification discloses that the court repeatedly emphasized and focused the jury's attention on the fact that the jurors must be satisfied beyond a reasonable doubt that the state proved the identification of the perpetrators as an essential element of the crime. We hold that the court's instructions, taken as a whole, particularly in the area of identification, fairly and adequately presented the case to the jury so that no injustice was done to the defendant in this case.

The defendant in his second claim of error contends that the court erred in refusing to declare a mistrial after the prosecutor, during his closing argument, brought to the jury's attention the failure of the defendant to call an alibi witness, whom the defendant testified he was with at the time of the incident. Following the prosecutor's remarks, the defendant promptly objected and out of the presence of the jury moved for a mistrial. The court denied the motion, but at the defendant's request instructed the jury to disregard the comment and to draw no conclusion with regard to his failure to call the witness.

It is the rule in Connecticut that " '[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " *State* v. *Watley,* 195 Conn. 485, 488, 488 A.2d 1245 (1985), quoting *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960). When counsel for either party intends to argue that such an inference should be drawn, a ruling from the trial court should be sought and obtained. *State* v. *Daniels,* 180 Conn. 101, 113, 429 A.2d 813 (1980); see *State* v. *Gonzalez,* 197 Conn. 677, 680, 500 A.2d 1330 (1985). The prosecutor in this case failed to seek permission to argue for

an adverse inference. Failure to seek an advance ruling does not, however, necessarily require the court to grant a mistrial. The court's refusal to grant a mistrial may be sustained under certain circumstances. The first is where, had the prosecutor sought an advance ruling for permission to argue an adverse inference, the court would have granted the request. *Secondino* v. *New Haven Gas Co.*, supra, 675, states that a two-pronged test must be satisfied before comment on a party's failure to call a witness would be proper. First, the witness must be within the party's power to produce, and second, the witness must be one that the party would naturally produce. Obviously, because the defendant testified that he was with his girlfriend on the night of the crime, he would be expected to produce her at the trial. Moreover, pursuant to General Statutes § 54-82i, the Uniform Act to Secure the Attendance of Witnesses from without the state in criminal proceedings, the witness was within the defendant's power to produce. This statute provides compulsory process to secure the attendance of witnesses residing in states which have enacted the reciprocal provisions of the act. The state of New Jersey, where the witness in question reportedly was living, adopted the act in 1941. See N.J. Stat. Ann. § 2A:81-19 (West 1976). Without a showing by the defendant that the act was inapplicable; see *Secondino* v. *New Haven Gas Co.*, supra, 675; the trial court could have granted the prosecutor's request, had one been made, to argue for an adverse inference. There was no showing that the witness was unavailable despite the fact that she was living in New Jersey at the time of trial. Here, the *Secondino* test would have been met, rendering the failure of the prosecutor to seek an advance ruling harmless error.

The second alternative for sustaining the trial court's failure to declare a mistrial is that the court's prompt

curative instruction removed any harm that might have resulted from the prosecutor's comments. A mistrial is an extreme remedy and is warranted only where it is apparent that as a result of some occurrence during trial a party has been deprived of an opportunity for a fair trial. *State* v. *DeMatteo,* 186 Conn. 696, 703, 443 A.2d 915 (1982); *State* v. *Gooch,* 186 Conn. 17, 25, 438 A.2d 867 (1982); *State* v. *Turcio,* 178 Conn. 116, 143, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980). When a mistrial is sought on the ground that a prosecutor's improper remarks violated the defendant's rights to due process, the same standard applies. *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982); *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978). The burden is on the defendant to show that the prosecutor's remarks were prejudicial in light of the entire proceeding. *State* v. *Cosgrove,* supra, 488–89; *State* v. *Hawthorne,* supra; *State* v. *Kinsey,* 173 Conn. 344, 348–49, 377 A.2d 1095 (1977). The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of prosecutorial misconduct. *State* v. *Cosgrove,* supra. The trial court's determination as to the fairness of the defendant's trial must be given great weight. *State* v. *McCall,* 187 Conn. 73, 77, 444 A.2d 896 (1982). Applying these principles to the facts and circumstances in this case, it is apparent that the trial court, based upon either of the alternatives recited above, cannot be said to have abused its discretion in denying the defendant's motion for a mistrial because of the improper remarks of the prosecutor.

The defendant's fourth claim of error needs little discussion. The claim is that the trial court erred in not suppressing the victim's in-court identification because it was based on suggestive police procedures. The

defendant's principal claim is that Arute's in-court identification was tainted because she was told the name of the prime suspect *after* her tentative selection of the defendant's photograph from the array. We have thoroughly discussed the identification process relative to this case in our analysis of the defendant's first claim of error. We need not say more except to point out that even had the police procedures been unnecessarily suggestive, the identification was reliable based on the totality of the circumstances and meets the mandates of *Neil* v. *Biggers,* supra. The trial court acted properly and did not abuse its discretion in denying the defendant's motion to suppress the victim's in-court identification of the defendant.

There is no error.

In this opinion the other judges concurred.