******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GERALD A.*
(AC 39126)

Alvord, Bright and Lavery, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree and risk of
    injury to a child in connection with his alleged sexual abuse of his minor
    daughter, K, the defendant appealed to this court. The defendant had
    been charged in separate informations with the sexual abuse of K and
    her sister, G. The trial court granted the state's motion for joinder, and
    the cases were tried together. The jury found the defendant not guilty
    of the charges related to G. *Held*:

1. The evidence was sufficient to support the defendant's conviction of one
    of the two counts of sexual assault in the first degree of which he had
    been convicted, as it was reasonable for the jury to conclude, beyond
    a reasonable doubt, that the defendant had engaged in sexual intercourse
    with K by digitally penetrating her vagina with his finger; on the basis
    of certain testimony from K that she flinched and clenched because it
    hurt when the defendant tried to put his finger inside of her vagina,
    the jury reasonably could have inferred that the defendant digitally
    penetrated, at the very least, her labia majora, which constituted sexual
    intercourse within the meaning of the applicable statute (§ 53a-65 [2]),
    and the trial court instructed the jury on the legal definition of sexual
    intercourse and that penetration, however slight, was sufficient to com-
    plete vaginal intercourse.

2. The trial court did not abuse its discretion when it admitted certain
    uncharged misconduct evidence in the form of testimony from K, G and
    their mother as to the defendant's alleged prior physical violence toward
    them and whether it could have caused K and G to delay reporting his
    sexual abuse: that court correctly determined that the testimony was
    relevant and material to the credibility of K and G, who were key
    witnesses for the state at trial and on whose credibility the state's case
    hinged, because it provided an explanation for their delay in disclosing
    the defendant's sexual abuse, and defense counsel indicated prior to
    trial that the issue of the delayed disclosures by G and K would be
    explored at trial; moreover, the trial court properly determined that the
    probative value of the challenged testimony was not outweighed by its
    prejudicial effect, as it did not tend to arouse the emotions of the
    jury or create a distracting side issue, the defendant was not unfairly
    surprised by the evidence given that the state filed a motion to introduce
    it three months before the start of trial, the matter did not consume an
    inordinate amount of time and the defendant had a full opportunity to
    cross-examine G and K.

3. The defendant could not prevail on his claim that the trial court improperly
    granted the state's motion for joinder of the two cases against him for
    trial, that court having properly exercised its discretion in permitting
    the cases to be tried together: the evidence in each case would have
    been cross admissible as prior misconduct in the other case and to
    show that the defendant had a propensity to engage in aberrant and
    compulsive sexual misconduct, as the incidents alleged by both G and
    K were not too remote in time from each other and were allegedly
    committed on similar persons, and the defendant's conduct toward G
    and K was similar in that his sexual abuse of them began when they
    were of a young, prepubescent age, it occurred in the family home when
    he was alone with them or when other family members slept and the
    abuse involved similar acts committed on each girl, and although G
    claimed that the defendant engaged in additional types of sexual miscon-
    duct with her and began abusing her at a younger age, that did not
    outweigh the numerous similarities in his abuse of G and K or render
    his misconduct with respect to G more severe and shocking than his
    misconduct with respect to K; moreover, the trial court properly deter-
    mined that the prejudicial effect of the evidence did not outweigh its
    probative value, and the defendant did not explain how the evidence
    would have been unduly prejudicial by showing that it demonstrated

more than his propensity to sexually assault G and K.

4. The trial court did not abuse its discretion when it denied the defendant's motion to make an opening statement to the jury; given that much of the material that defense counsel sought to discuss was covered by his cocounsel during jury selection, that defense counsel had requested that the court permit cocounsel to conduct jury selection, that defense counsel robustly addressed the jury during introductions of counsel, and the court's statement that the items that counsel wanted to discuss in the opening statement could be addressed during, and were more appropriate for, closing argument, the defendant was unable to show that the court's ruling was harmful and was not deprived, in a meaningful way, from addressing the jury prior to the receipt of evidence.

Argued January 3—officially released July 3, 2018

*Procedural History*

Two substitute informations charging the defendant in each case with two counts of the crime of sexual assault in the first degree and three counts of the crime of risk of injury to a child, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Colin, J.*, granted the state's motion for joinder and denied the defendant's motion for severance; thereafter, the court denied the defendant's motion to make an opening statement; subsequently, the matter was tried to the jury; thereafter, the court granted the state's motion to introduce certain evidence; verdicts and judgment of guilty of two counts of sexual assault in the first degree and three counts of risk of injury to a child, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, senior assistant public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Maureen V. Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Gerald A., appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that: (1) there was insufficient evidence presented at trial to convict him of one count of sexual assault in the first degree; (2) the trial court improperly admitted evidence of his prior misconduct; (3) the trial court improperly granted the state's motion for joinder of two separate cases against him; and (4) the trial court improperly denied his motion to make an opening statement to the jury. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The defendant and A (mother) were married in 1980 in Port-au-Prince, Haiti. The couple had two daughters who were born in Haiti, G in 1991 and K in 1993. When the children were young, the defendant moved to the United States. The mother and the children remained in Haiti until 1998, when they moved to Connecticut to join the defendant.[1] The family first lived on Hope Street in Stamford.

In May, 1999, the mother gave birth to the couple's third daughter, R. Before R's birth, while the mother was pregnant, the family moved to a two bedroom apartment on Adams Avenue. In 2001, the family moved to a bigger apartment on Roosevelt Avenue in Stamford. At about that time, the mother began working two jobs. At most times during the marriage, the mother worked and the defendant was unemployed. Because he did not work outside of the home, the defendant cared for the children while the mother was at work.

While the family lived on Roosevelt Avenue, the defendant began sexually abusing K, who was six or seven years old.[2] The first incident that K remembers occurred on a weekend day, when the mother was not home. K was preparing to shower, and when she entered the bathroom, the defendant was there, sitting on the edge of the bathtub, and talking on the phone. When K removed her towel and attempted to get into the bathtub, the defendant stopped her. The defendant laid K on his lap and touched her vagina.

Another incident, also while the family lived on Roosevelt Avenue, occurred when the family was preparing to go to a wedding. When K went "to see what was taking him so long" to get ready, the defendant took her into his bedroom. The defendant laid K on the bed, removed her underwear, and began touching her vagina. The defendant "tried to put his finger inside" K's vagina, but she "flinched 'cause it hurt," and he stopped. The

defendant put K's underwear back on, and she left his bedroom.

Between 2003 and 2004, the family moved to Myano Lane. On Saturdays, K, who was nine or ten years old at the time, was responsible for cleaning the bathroom. One Saturday, the family was preparing to visit with a relative who was visiting from Pennsylvania. Because K cleaned the bathroom, she showered last. When K finished showering, she went into the bedroom that she shared with her sisters, wearing only a towel. The defendant was in her room. The defendant laid K down on the bed and began sucking on her breasts. The defendant then performed oral sex on K. Afterward, K "felt so nasty," that she showered again.

On another occasion while the family lived on Myano Lane, K was preparing to attend church on a Sunday morning. Wearing only a towel, K went to the bathroom to shower, but the door was closed. She knocked on the door, and the defendant opened the door and pulled her into the bathroom, shutting the door behind them. The defendant then laid K on his lap and touched her vagina. Afterward, K showered.

On a fifth occasion, K, who was ten years old at the time, was reading in her room with the door open on a Saturday. The defendant walked by and then came into the room. He asked K what book she was reading, and then put his hands down her shorts and began touching her vagina. When the defendant stopped touching K's vagina and left the room, K thought that he was finished, but the defendant returned with Vaseline on his hand and began touching her vagina again. Afterward, K washed herself with soap and water.

In May, 2005, the mother purchased a home for the family in Stratford. The defendant left the family home in October, 2007. The mother subsequently filed for divorce.

In 2012, while she was attending college in California, K disclosed the sexual abuse to G, who recently had given a voluntary statement to the Stamford Police Department in which she alleged that the defendant had sexually abused her during her childhood, beginning at age three. In connection with G's allegations, under docket number CR-12-0177252-T, the defendant was charged with two counts of sexual assault in the first degree and three counts of risk of injury to a child. K returned to Connecticut in May, 2012. When she returned, she went to the Stamford Police Department and gave a voluntary statement regarding the defendant's sexual abuse of her. In connection with K's allegations, under docket number CR-12-0177635-T, the defendant was charged with two counts of sexual assault in the first degree and three counts of risk of injury to a child. The state filed a motion for joinder, which the court granted.

At the time of trial, the state filed a consolidated ten count long form information charging the defendant with four counts of sexual assault in the first degree and six counts of risk of injury to a child. Counts one through five of the information related to G's allegations, and counts six through ten related to K's allegations. The jury found the defendant guilty of counts six and eight, which charged him with sexual assault in the first degree, and counts seven, nine and ten, which charged him with risk of injury to a child. The jury found the defendant not guilty of counts one through five. The court sentenced the defendant to a total effective term of twenty years incarceration, four of which were a mandatory minimum, followed by twenty years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence presented at trial was insufficient to convict him of one count of sexual assault in the first degree. Specifically, the defendant argues that the state failed to prove that he engaged in sexual intercourse with K, within the meaning of § 53a-70 (a) (2), because K did not testify that he digitally penetrated her vagina. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. The state charged the defendant, in count six of the information, with sexual assault in the first degree in connection with an act of abuse he committed against K while the family was living on Roosevelt Avenue.[3] At trial, K testified that the family was preparing to go to a wedding and that the girls had not yet put on their dresses. The defendant was still getting dressed, so K went to the bathroom "to see what was taking him so long." The defendant took K into his bedroom, laid her on the bed, removed her underwear, and began touching her vagina. The defendant "tried to put his finger inside" K's vagina, but she "flinched 'cause it hurt . . . ." The defendant put K's underwear back on, and she left his bedroom.

On cross-examination, the following colloquy occurred:

"[Defense Counsel]: And during any of these incidents, did he penetrate you?

"[K]: Are we talking about [this] one incident?

"[Defense Counsel]: An[y] of . . .

"[K]: Yes, he did when I was living in . . . Roosevelt.

"[Defense Counsel]: Oh.

"[K]: That was the day that, the wedding, he tried to.

"[Defense Counsel]: Well, there's a difference between try and penetrate; right?

"[K]: Well, I was six, so.

"[Defense Counsel]: So, you don't know whether he penetrated you or not at that incident?

"[K]: He tried to when I was at . . . Roosevelt, but he couldn't. . . .

"[Defense Counsel]: There's a difference between tried to penetrate and penetrate. Would you agree with me; right? Try to penetrate and penetrate are two different things; are they not?

"[K]: Well, it depends on what you're talking about.

"[Defense Counsel]: Well, if I attempt to do something, it's different from me doing something; right?

"[K]: Yes.

"[Defense Counsel]: Okay. If I try to do something, it's different from doing it; right?

"[K]: No, it's not different.

"[Defense Counsel]: It's not different?

"[K]: He tried to do something. . . .

"[Defense Counsel]: In any of these occasions did he penetrate you? . . .

"[K]: I was six years old. He tried to, but I clenched. It hurt. Like, he didn't go inside. . . .

"[Defense Counsel]: So, on none of these occasions did he penetrate you with any part of his body; correct?

"[K]: I just said that he tried to in—Roosevelt.

"[Defense Counsel]: I understand that tried part. But on one of these occasions was he successful, how is that, in penetrating you?

"[K]: None of the occasions was he successful.

"[Defense Counsel]: So, he never fully penetrated you; correct?

"[K]: Successfully."

On redirect examination, K testified that the defendant touched her vagina and tried sticking his finger inside of her vagina. She testified that it hurt "[t]he minute he tried to—like the second he tried to." The prosecutor asked, "[p]ast your vagina?" and K responded,"[y]es."

We begin with the applicable standard of review and principles of law that guide our analysis. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder

of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Elmer G.*, 176 Conn. App. 343, 349–50, 170 A.3d 749, cert. granted on other grounds, 327 Conn. 971, 173 A.3d 952 (2017).

"The jury is entitled to draw reasonable and logical inferences from the evidence. [T]he jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [I]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Prosper*, 160 Conn. App. 61, 71, 125 A.3d 219 (2015).

The jury found the defendant guilty of one count of sexual assault in the first degree in connection with the wedding day incident. "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ." General Statutes § 53a-70 (a). The defendant's sole challenge to his conviction under § 53a-70 (a) (2) is that the state failed to prove beyond a reasonable doubt that he engaged in sexual intercourse with K.

General Statutes § 53a-65 (2) defines sexual intercourse as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. . . . Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen . . . ." "[D]igital penetration, however slight, of the genital opening, is sufficient to constitute vaginal intercourse." (Internal quotation marks omitted.) *State* v. *Anthony L.*, 179 Conn. App. 512, 519, 179 A.3d 1278, cert. denied, 328 Conn. 918, 181 A.3d 91 (2018).

Our Supreme Court's decision in *State* v. *Albert*, 252 Conn. 795, 750 A.2d 1037 (2000), informs our analysis of the defendant's sufficiency claim on appeal. In *Albert*, our Supreme Court looked to the language and legislative history of § 53a-65 (2) and held that the genital opening includes the labia majora,[4] and therefore, "digital penetration, however slight, of the *labia majora* is sufficient penetration to constitute vaginal intercourse under § 53a-65 (2)." (Emphasis in original.) Id., 809. The defendant in *Albert* was convicted, inter alia, of sexual assault in the first degree, in connection with an incident in which he put his hand in the three year old victim's bathing suit and touched her "inside" her "crotch." (Internal quotation marks omitted.) Id., 797. When the victim's pediatrician examined her shortly thereafter, she observed two scrapes on the inside fold of the victim's labia majora. Id., 798.

On appeal, our Supreme Court rejected arguments by the defendant that § 53a-65 (2) required penetration beyond the labia majora to at least the labia minora, and that a "mere touching of the surface of the labia majora is not sufficient to constitute penetration . . . ." Id., 813. The court opined: "As we previously indicated, we disagree with the defendant's suggestion that a defendant must put his finger or fingers 'beyond the labia majora' for his conduct to fall within the definition of sexual intercourse in § 53a-65 (2)."[5] Id. The court noted that the "evidence presented in this case from which a reasonable jury could have concluded that the defendant put his finger beyond the victim's labia majora" included the victim's testimony that the defendant touched her " '[i]nside' " her "crotch," the scrapes on the victim's labia majora, and, most relevant to our present analysis, the victim's indication that "the touching hurt her . . . ." Id.

In light of the evidence presented in this case, it was reasonable for the jury to conclude that the defendant engaged in sexual intercourse with K by digitally penetrating her vagina. K testified that the defendant "tried to put his finger inside" of her vagina, but she "flinched 'cause it hurt . . . ." On cross-examination, defense counsel repeatedly asked her whether the defendant "penetrated" her vagina, or merely "tried to." Although K testified that the defendant never "[s]uccessfully"

penetrated her vagina, she also testified that the defendant "tried to, but I clenched. It hurt. Like, he didn't go inside." On the basis of K's testimony that she flinched when the defendant tried to put his finger inside of her vagina because it hurt, she clenched and it hurt, the jury was free to draw the reasonable inference that the defendant at least digitally penetrated K's labia majora. See *State* v. *Edward B.*, 72 Conn. App. 282, 296, 806 A.2d 64 ("[s]ignificantly, [the victim] testified that the defendant hurt her when he placed his hands under her clothes below her waist and moved his hands"), cert. denied, 262 Conn. 910, 810 A.2d 276 (2002).

As we previously have noted, "[t]he jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [I]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . ." (Internal quotation marks omitted.) *State* v. *Prosper*, supra, 160 Conn. App. 71. The court instructed the jury as to the legal definition of "sexual intercourse," and informed it that "[p]enetration, however slight, is sufficient to complete vaginal intercourse . . . ." The jury was free to infer, on the basis of this record and its common sense, that if K "flinched" and "clenched" because "[i]t hurt" when the defendant "tried to put his finger inside" of her vagina, that the defendant digitally penetrated, at the very least, K's labia majora.

Construing the evidence in the light most favorable to sustaining the jury's verdict, we conclude that there was sufficient evidence before the jury from which it could find beyond a reasonable doubt that the defendant was guilty of sexual assault in the first degree.[6]

II

The defendant next claims that the trial court improperly admitted evidence of uncharged misconduct in the form of testimony of the mother, G, and K that the defendant was physically abusive to them.[7] Specifically, he argues that this evidence had "no or minimal relevance," was "clearly prejudicial," and its admission "denied the defendant of his due process rights to a fair trial." We are not persuaded.

The following procedural history is relevant to our resolution of this claim. On December 8, 2014, the state filed a motion in limine in which it sought, in relevant part, to present "evidence of domestic violence, which was ongoing within the family home." The state argued that this evidence would not be "necessarily other misconduct evidence," but bore on G and K's "ability and/ or willingness to disclose the abuse to authorities." Alternatively, the state argued that if the court found this evidence to be other misconduct evidence, it was admissible pursuant to § 4-5 (c) of the Connecticut Code

of Evidence[8] to "corroborate crucial prosecution testimony of the witnesses" and was "necessary to lay a foundation for expert testimony." The state claimed that the proposed evidence was offered for the acceptable purposes of explaining the behavior of G and K, and laying a foundation for expert testimony that would explain why they did not disclose the alleged sexual abuse until adulthood, and that the probative value of this evidence on these issues outweighed its prejudicial effect.

On January 12, 2015, the defendant filed a memorandum of law in opposition to the state's motion in limine, in which he argued that the state was "merely speculating that any alleged domestic abuse in the household may have delayed or impacted the witnesses' ability to disclose the alleged abuse to authorities." The defendant argued that any evidence of physical abuse was irrelevant to the current charges and was more prejudicial than probative. The defendant noted that the claims of physical abuse were unsubstantiated by corroborating evidence.

The court held a hearing on January 15, 2015.[9] On January 20, the court issued a memorandum of decision, in which it deferred ruling on the motion until the time of trial. At trial, outside the presence of the jury, the state proffered that the mother, G, and K would testify that during the time they lived with the defendant, "there was frequent domestic violence in the home." Specifically, the state anticipated that the mother would testify about domestic violence that began while the family was living in Haiti and increased when the family moved to the United States. The state represented that the mother also would testify that she observed the defendant discipline the children by striking them with a belt when they were naked and that the defendant would throw things at her. The state further represented that the mother would testify about two specific incidents: one in which the police were called to the house, but the mother did not want the defendant arrested, and a second one in which the defendant injured her and she went to a hospital, but did not report that the defendant had assaulted her.

The state also represented that G and K would testify about the "discipline tactics" of the defendant, that they often heard screaming and yelling between the defendant and their mother, and that they observed their mother injured after some of these screaming and yelling incidents. The state also proffered evidence about G and K's half brother, who reported to the Department of Children and Families (department) that he had been assaulted by the defendant. The state represented that there would be testimony that the defendant, and possibly the mother, instructed G and K not to cooperate with the department's investigation, and that their half brother was sent back to Haiti as punish-

ment. The state represented that it did not intend to "go into too much detail" regarding the physical abuse, and argued that because the alleged physical abuse was happening contemporaneously with the sexual abuse, this evidence was necessary to "complete the story of what was happening in the home at the time."

Defense counsel argued that the alleged physical violence could not be admitted as bearing on G and K's late disclosures, because the defendant left the family home in 2007 and the disclosures were not made until 2012. Defense counsel noted that the defendant was not living in Connecticut in 2012, and argued that due to the defendant's absence from the state at the time that G and K disclosed, they were not "under an imminent fear of him at that point," and were "not in imminent danger at that point." The defendant further argued that because this was a case alleging sexual assault, physical violence was irrelevant to the crimes charged and had no probative value. As to the proffered testimony regarding the department's investigation, defense counsel argued that because he believed that the half brother still resided in Haiti, he would be unable to call him as a witness to refute that testimony. Defense counsel argued that the proffered evidence was prejudicial, had no probative value, constituted "bad character evidence," and that despite any limiting instruction the court might give, the jury would use the evidence to conclude that the defendant was "a bad guy."

Defense counsel conceded that he planned to cross-examine the witnesses on the issue of their late disclosures. When the court asked whether such questioning on cross-examination would open the door to this evidence, defense counsel responded that in light of the fact that G and K disclosed the sexual abuse five years after the defendant moved out of the family home, he hoped that it would not.[10]

The court ruled orally on the state's motion. First, on the issue of whether the evidence properly was characterized as uncharged misconduct evidence, the court observed that it was "not so sure it is uncharged misconduct evidence, as opposed to evidence being offered to explain the reasons why the complainants waited for years to report the alleged assaults. Rather, it's related to their credibility." The court relied on two cases, *State* v. *Cruz*, 56 Conn. App. 763, 746 A.2d 196 (2000), aff'd, 260 Conn. 1, 792 A.2d 823 (2002),[11] and *State* v. *Daniels*, 42 Conn. App. 445, 681 A.2d 337, cert. denied, 239 Conn. 928, 683 A.2d 397 (1996),[12] and ruled that "as a basis to aid the jury, perhaps, if it believes the testimony, in assessing the credibility of the two alleged victims in this case, under *State* v. *Cruz* [supra, 763] and *State* v. *Daniels* [supra, 445], that evidence is admissible."

The court further ruled that even if this evidence were categorized as uncharged misconduct evidence, it

would be admissible under § 4-5 (c) of the Connecticut Code of Evidence to corroborate crucial prosecution testimony, specifically, testimony about why G and K waited to report the alleged sexual abuse. The court noted that defense counsel was free to explore on cross-examination the period of delay between when the defendant left the home and when G and K reported the sexual abuse, as "that argument goes to the weight of the proposed testimony, not its admissibility." The court further noted that defense counsel twice indicated that he would explore the issue of the delayed disclosure on cross-examination.

The court concluded that the probative value of the evidence outweighed its prejudicial effect, but noted its intent to give the jury a limiting instruction explaining that the evidence was to be used only for the purpose of assessing the credibility of G and K as to why they delayed in reporting. The court cautioned counsel that it did not want "a collateral trial on the details of the claims= they're going to make about what happened to them." The court also ruled that evidence about G and K's half brother was inadmissible, and limited the physical violence evidence to testimony from the mother, G, and K about any incidents of alleged violence that they personally witnessed or that were inflicted on them.

During the state's case-in-chief, G testified that while she lived with the defendant, there were incidents when he hit her. She testified that, more than once, a "couple times a year," the defendant would hit her with a belt. She described one incident that occurred while the family was living on Hope Street: "I was going to school, and we—when we go to school, he drives us, and we have to like, give him a kiss on the cheek. And for some reason, that day I didn't want to. So, when I got home later on, he took off my underwear and my pants, and he hit me with the belt because I didn't kiss him on the cheek when he dropped me off at school." Immediately following this testimony, the court gave a limiting instruction to the jury.[13] G further testified that she did not disclose this to a teacher because she was scared that the defendant would kill her mother, and that on one occasion, after he had sexually abused G, he told her to keep her "mouth shut" about the sexual abuse and that if she told anyone about the sexual abuse, "bad things were going to happen." Although G never witnessed the defendant hit her mother, she testified that she heard arguments between her mother and the defendant and, after these arguments, observed swelling on her mother's face. Immediately following this testimony, the court gave a limiting instruction.[14] G also testified that she observed the defendant hit K with a belt as a form of discipline. She also testified that her mother never protected her and K from being hit. Following this testimony, the court again gave a limiting instruction.[15]

K testified that the defendant was physically abusive toward her. She recalled a specific incident that occurred on Roosevelt Avenue: "On one day I was living in . . . Roosevelt and I was eating cereal and I didn't want to finish eating the cereal or something or I didn't like the cereal. And he said that I had to finish eating it. And so I just sat there. He turned off all the lights in the kitchen and I just sat there in the dark and I was crying. And then, he came back into the kitchen and took the bowl of cereal away. And then, when I got up to go, he smacked me across my face so hard that I slid from the kitchen table all the way against the cabinets in the kitchen. And the kitchen was pretty big, too." She further testified that the defendant disciplined her and G by hitting them, smacking them across the face, hitting them on the hands, and sometimes, making them strip naked and hitting them with a belt or the back of his hand. At the conclusion of K's testimony, the court gave a limiting instruction to the jury.[16]

The mother testified that while she was married to the defendant, she observed him hitting the children. She also testified that during their marriage, she and the defendant would argue. She described one incident in which an argument turned violent and she sustained an injury to her face. Immediately following this testimony, the court gave a limiting instruction to the jury.[17] The mother then testified that when the defendant disciplined G and K, he would do so with a belt. Immediately following this testimony, the court informed the jury: "In the instruction I just gave you on the last piece of testimony goes for this testimony as well." See footnote 16 of this opinion.

The state also presented the testimony of Dr. Larry Rosenberg, a clinical psychologist and an expert in child psychology, who testified that the majority of children who are sexually abused in childhood do not disclose the abuse until adulthood. He opined that this is usually caused by fear, "but there are different types of fears." Dr. Rosenberg explained that a victim may fear physical threat, even where those threats have not been made explicitly by the abuser, as a result of domestic violence or physical abuse that has occurred in the home. He also opined that children may fear "a threat to the nonoffending parent with regard to the offending parent."

After the close of evidence, the court charged the jury with respect to this evidence as follows: "You will recall on occasion I have ruled that some testimony and evidence have been allowed for a limited purpose. Any testimony or evidence which I identified as being limited to a purpose, you will consider it only as it relates to the limits for which it was allowed, and you shall not consider such testimony and evidence in finding any other facts as to any other issue.

\* \* \*

"Other alleged misconduct of the defendant, limited use instruction. The state has offered evidence of other acts of misconduct of the defendant. Specifically, the state offered evidence of the defendant's allegedly being physically abusive toward one or more of his children and their mother. This evidence was admitted for a limited purpose only. The evidence is not being admitted to prove any bad character, propensity or criminal tendencies of the defendant. Such evidence, if you believe it, is being admitted solely to explain why the alleged victims delayed in their reporting of the sexual—alleged sexual abuse. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate any criminal propensity.

"You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it was offered by the state, but only as it may bear on the issue of the alleged victims delayed reporting of their claimed abuse. This evidence cannot be used by you for any other purpose.

"On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the issue for which it was offered by the state, namely, to explain the delayed reporting by the alleged victims, then you may not consider that testimony for any purpose. You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For this reason, you may consider this evidence only on the limited issue I described and for no other purpose."

We begin with the applicable standard of review and principles of law that guide our analysis. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Estrella J.C.*, 169 Conn. App. 56, 93, 148 A.3d 594 (2016).

"As a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Internal quotation marks omitted.) *State* v. *Martin V.*, 102 Conn. App. 381, 385, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007); see also Conn. Code Evid. § 4-5 (a). "In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Sec-

ond, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . .

"Under the first prong of the test, the evidence must be relevant[18] for a purpose other than showing the defendant's bad character or criminal tendencies. . . . Recognized exceptions to this rule have permitted the introduction of prior misconduct evidence to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. Conn. Code Evid. § 4-5 [(c)]." (Citations omitted; internal quotation marks omitted; footnote in original.) *State* v. *Martin V.*, supra, 102 Conn. App. 385–86.

"The official commentary to § 4-5 (c) states in relevant part: Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be admissible, the court must determine that the evidence is probative of one or more of the enumerated purposes for which it is offered, and that its probative value outweighs its prejudicial effect. . . . *The purposes enumerated in subsection (c) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive.* Neither subsection (a) nor subsection (c) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors. . . . Conn. Code Evid. § 4-5 (c), commentary." (Emphasis in original; internal quotation marks omitted.) *State* v. *Estrella J.C.*, supra, 169 Conn. App. 96.

Here, the court determined that the challenged uncharged misconduct evidence showing that the defendant was physically abusive to his wife and children was relevant to the issue of the credibility of G and K, particularly as to why they delayed in reporting the sexual abuse. The challenged testimony was material to this issue, as G and K were the state's key witnesses at trial, and the state's case hinged on their credibility. As the court noted, defense counsel indicated both during argument and in a pretrial filing that she would explore the issue of G and K's delayed disclosures. The credibility of both G and K, and their behavior, therefore, would be called into question by the defense. We note the well recognized principle that

"[i]ssues of credibility typically are determinative in child sexual abuse prosecutions. This is so because in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses." (Internal quotation marks omitted.) Id., 98. We conclude that this uncharged misconduct evidence provided an explanation for why G and K delayed in disclosing the sexual abuse and, therefore, the court was correct in its determination that it was relevant because it bore on the important issue of their credibility as witnesses.[19]

We now turn to the trial court's determination that the probative value of this evidence outweighed its prejudicial effect. "Section 4-3 of the Connecticut Code of Evidence . . . provides that [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. [T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge and is subject to reversal only where an abuse of discretion is manifest or injustice appears to have been done. . . . [Our Supreme Court] has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) Id., 98–99.

We conclude that the court properly determined that the probative value of the challenged testimony was not outweighed by its prejudicial effect. This uncharged misconduct evidence did not tend to arouse the emotions of the jury, especially in light of the nature of the crimes with which the defendant had been charged, crimes that alleged his sexual abuse of his daughters. See id., 99; see also *State* v. *Vega*, 259 Conn. 374, 398, 788 A.2d 1221 ("evidence of dissimilar acts is less likely to be prejudicial than evidence of similar or identical acts" [internal quotation marks omitted]), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). This lack of prejudice is especially true in light of the fact that the jury found the defendant guilty of only five counts of a ten count information, suggesting that the evidence did not "most certainly . . . arouse the emotions and passions of the jury," to the extent that the defendant suggests. The evidence also did not create a distracting side issue, as it "pertained to the credibility of the state's key witness[es], which was the essence of the state's case." *State* v. *Estrella J.C.*, supra, 169

Conn. App. 99–100. The evidence and counterproof of it did not consume an inordinate amount of time, as it occurred at the beginning of trial. Furthermore, the defendant cannot claim that he was unfairly surprised by this evidence. The state filed a motion in limine three months prior to the start of trial, in which it notified the defendant of its intention to elicit this testimony; see id., 100; and, at argument on January 15, 2015, represented to the court and defense counsel the anticipated substance of this testimony. See footnote 8 of this opinion. Finally, the defendant had a full opportunity to cross-examine G and K on whether the physical violence years before could have actually caused them to delay reporting.

The court did not abuse its discretion in admitting the uncharged misconduct evidence.

III

The defendant next claims that the court improperly granted the state's motion for joinder of the two separate cases against him for trial. Specifically, the defendant argues that he was substantially prejudiced by the joinder of two informations, one charging the defendant in connection with allegations of abuse made by G and one charging the defendant in connection with allegations of abuse made by K, because both cases "depended solely on the credibility of the witnesses," and "the fact that there were two accusers increased their credibility." The defendant further argues that "none of the extreme prejudicial effect caused by the joinder of the cases had been mitigated because the trial court failed to give any cautionary instructions." We disagree.

The following procedural history is relevant to our resolution of this claim. The state initially charged the defendant in two separate informations, one containing the counts related to G's allegations of abuse, and one containing the counts related to K's allegations of abuse. On December 8, 2014, pursuant to Practice Book §§ 41-3 and 41-19, the state filed a motion for joinder of the cases for trial. In its motion, the state argued that the defendant would not be substantially prejudiced by joinder because the evidence satisfied the factors enunciated by our Supreme Court in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), or alternatively, because the evidence was cross admissible pursuant to this court's decision in *State* v. *Webb*, 128 Conn. App. 846, 19 A.3d 678, cert. denied, 303 Conn. 907, 32 A.3d 961 (2011). The state acknowledged that the court could "give a jury instruction at the time of the proposed testimony and at the conclusion of trial so that the evidence will be used for its proper purpose."

On January 12, 2015, the defendant filed a motion in which he requested that the court "sever the two above docket numbers and deny the state's motion for join-

der." The defendant also filed a memorandum of law in opposition to, in relevant part, the state's motion for joinder, in which he argued that "by joining these cases for trial there would be extreme prejudice to the defendant in that there would be [a] strong likelihood of the introduction of overlapping evidence, which could improperly lead an otherwise fair and impartial jury to convict the defendant based on cumulative evidence introduced that has no relevance or bearing to an offense of misconduct charged in each information."

The court heard argument on the motion for joinder on January 15, 2015. In a memorandum of decision, the court granted the state's motion for joinder, overruled the defendant's objection to the motion for joinder, and denied the defendant's motion to sever. The court first concluded that the state had met its burden of proving that the defendant would not be substantially prejudiced by the joinder because the evidence would be cross admissible at separate trials pursuant to § 4-5 (b) of the Connecticut Code of Evidence and our Supreme Court's decision in *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). The court then considered the *Boscarino* factors. The court concluded that the defendant would not be unfairly prejudiced by the joinder, and ordered jury selection to begin on February 4, 2015.

On February 4, the state filed a ten count long form information, which charged five counts as to G's allegations of abuse and five counts as to K's allegations of abuse. Before evidence began, the court instructed the jury that "[e]ach charge against the defendant is set forth in the information as a separate count, and you must consider each count separately in deciding this case."

The state called G to testify first. She testified that the defendant began sexually abusing her in Haiti. She testified that, beginning when she was three years old, when the defendant returned to Haiti to visit the family, while the rest of the family was asleep, he would place her on his lap, on top of his shorts, and push her against his penis.

She also testified about five specific incidents of abuse. First, she testified that while the family was living on Adams Avenue, the defendant would come into her room early in the morning while everyone was asleep, remove her underwear, rub his penis on her vagina until he ejaculated, and then clean her with a wet cloth. Second, she described an incident on Roosevelt Avenue that occurred when she was approximately twelve years old. She testified that the defendant came into the room that G was in with her sisters, brought her into his bedroom, locked the door, removed her shorts and underwear, held her down, and engaged in penile-vaginal intercourse with her. Third, G testified about a time on Roosevelt Avenue when the defendant took her into his bedroom, locked the door, laid her

down, took off her pants and underwear, and performed oral sex on her. Fourth, she testified about an incident on Roosevelt Avenue when the defendant French-kissed her and touched her breasts. Finally, she testified that when the family was living on Myano Lane, the defendant came into her room, locked the door, lay down next to her on the bed, and performed oral sex on her.

While the family lived on Myano Lane, G began menstruating. She was thirteen years old. G testified that once she began menstruating, "the molestation decreased drastically, and it was just mostly touching, fondling; there was no penis to vagina touching anymore after I started menstruating."

In addition to K's testimony about the five charged incidents of abuse, as set forth in the facts and part I of this opinion, K also testified that when the family lived in the Stratford home, the defendant would touch her vagina with his hand, suck on her breasts, and perform oral sex on her. She testified that this continued until she began menstruating when she was eleven years old.

Prior to the conclusion of the state's case-in-chief, the court instructed the jury as follows: "[J]ust to remind you—and you'll hear this instruction again later on in the case, at the end of the case, that you are going to be required to independently evaluate each and every [count] of the information; so, there's ten. You're going to have to evaluate each one independently and separately and make an independent determination of your verdict on each count independently from the others. So, I want to remind you of that." In its final instructions, the court instructed the jury that it must make a "separate and independent determination" of guilt as to each of the ten counts, it must deliberate on each count separately, the total number of counts charged did not add to the strength of the state's case, and that "[e]ach count is a separate entity."[20] After deliberation, the jury returned a verdict of not guilty on counts one through five of the information, all counts related to the allegations of abuse alleged by G, and returned a verdict of guilty on counts six through ten of the information, all counts related to the allegations of abuse made by K.

We begin with the applicable standard of review and principles of law that guide our analysis. "The principles that govern our review of a trial court's ruling on a motion for joinder or a motion for severance are well established. Practice Book § 41-19 provides that, [t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together. . . . In deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The

defendant bears a heavy burden of showing that [join-der] resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 543–44, 34 A.3d 370 (2012).

"A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, where evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper where the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . Where evidence is cross admissible, therefore, our inquiry ends.

"Substantial prejudice does not necessarily result from [joinder] even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense. . . . Consolidation under such circumstances, however, may expose the defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . .

"[Accordingly, the] court's discretion regarding joinder . . . is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, [in *State* v. *Boscarino*, supra, 204 Conn. 722–24] we have identified several factors that a trial court should consider in deciding whether a severance or [denial of joinder] may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all

of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 155–56, 51 A.3d 1048 (2012).

We begin our analysis by determining whether the evidence in the cases concerning G and K was cross admissible, such that evidence in each case would have been admissible as prior misconduct in the other case. "[A]s a general rule, prior misconduct evidence is inadmissible to prove the defendant's bad character or criminal tendencies. See Conn. Code Evid. § 4-5 (a) . . . . In *State* v. *DeJesus*, supra, 288 Conn. 470, however, our Supreme Court recognized a *limited* exception to the prohibition on the admission of uncharged misconduct evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior. . . . This exception to the admission of propensity evidence was subsequently codified in § 4-5 (b) of the Connecticut Code of Evidence.

"Under § 4-5 (b) of the Connecticut Code of Evidence and *DeJesus*, evidence of uncharged sexual misconduct is admissible if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged." (Emphasis in original; internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 88–89, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018). Such evidence is admissible if: "(1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect." Conn. Code Evid. § 4-5 (b).

"In assessing the relevancy of such evidence, and in balancing its probative value against its prejudicial effect, the trial court should be guided by this court's prior precedent construing the scope and contours of the liberal standard pursuant to which evidence of uncharged misconduct previously was admitted under the common scheme or plan exception. Lastly, prior to admitting evidence of uncharged sexual misconduct under the propensity exception . . . the trial court must provide the jury with an appropriate cautionary instruction . . . .

"Recognizing the difficulties of balancing the probative value of the evidence against its prejudicial effect, we have held that the trial court's decision will be reversed only whe[n] abuse of [its] discretion is mani-

fest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Devon D.*, 321 Conn. 656, 666, 138 A.3d 849 (2016).

Applying these standards in the present case, we conclude that the trial court properly exercised its discretion in permitting the cases to be tried together because the evidence in both cases was cross admissible. On appeal, the defendant does not challenge the trial court's finding that the cases involved aberrant and compulsive sexual misconduct, so we turn first to the question of relevancy. It is undisputed that the incidents alleged by both G and K were not too remote in time from each other, and were allegedly committed upon similar persons (i.e., the defendant's prepubescent daughters). See, e.g., id., 667 ("[a]ll three victims are prepubescent children of similar age who are the defendant's biological children"). The gravamen of the defendant's argument on appeal is that his conduct with respect to G and K was not sufficiently similar in nature and circumstances. Specifically, he argues that G's claims were more severe and "of a slightly different nature" than K's claims. We disagree.

With respect to the similarity of conduct, our Supreme Court repeatedly has recognized that it "need not be so unusual and distinctive as to be like a signature . . . [but] [r]ather, the question is whether the evidence is sufficiently similar to demonstrate a propensity to engage in the type of aberrant and compulsive criminal sexual behavior with which he . . . [was] charged." (Citation omitted; internal quotation marks omitted.) Id., 668. We find our Supreme Court's decision in *State* v. *Devon D.*, supra, 321 Conn. 656, instructive on this issue. There, the defendant was charged with crimes in connection with the sexual abuse of his three children, one girl and two boys. Id., 658–59. On appeal, the defendant argued that the trial court erred in denying his motion to sever the three cases against him. Id., 662. Our Supreme Court rejected that argument and held that pursuant to *DeJesus*, the evidence concerning all three of the defendant's children was cross admissible. Id., 666.

The court in *Devon D.* concluded that the defendant's conduct as to each victim was "sufficiently similar to demonstrate that he had a propensity toward aberrant sexual behavior." Id., 667. The daughter claimed that the defendant placed his penis on her stomach; touched her vagina with his fingers; poured lotion on her body; ejaculated on her body; inserted his finger into her vagina while bathing her and using a rag, causing her to bleed; forced her to watch a pornographic movie with her siblings; warned her not to tell anyone about the abuse; penetrated her vaginally with his penis;

attempted to penetrate her anally with his penis; forced her to perform fellatio on him, causing her to vomit; put vinegar, or a substance that stung, on her vagina and in her ear; and tried to put his penis in her ear, causing it to bleed. Id., 659–60. One of the sons claimed that the defendant: inserted a rag-covered finger into his anus; rubbed his penis; forced him to watch a pornographic movie with his siblings; and warned him not to tell anyone about the abuse. Id., 660. The other son claimed that the defendant inserted his finger into his anus, and that he had been using a rag but the rag " 'slipped' "; squeezed his penis; pulled back his foreskin; made him shower with his brother; forced him to watch a pornographic movie with his siblings; and warned him not to tell his mother about the bathing. Id. The abuse occurred during the defendant's unsupervised visitation with the children at his home or his mother's home. Id., 667.

As to the similarity of the conduct with respect to each of the victims, the court noted the following similarities: (1) the abuse occurred when the defendant had time alone with each of the victims; (2) the defendant had forced all of the victims to watch a pornographic movie; (3) the defendant abused each victim in the shower under the guise of bathing them with a rag; (4) the purported bathing of the victims resulted in digital vaginal or anal penetration; (5) the defendant touched each of the victims inappropriately when he was not using the rag; and (6) the defendant warned each of the victims not to tell anyone about his conduct. Id., 667–68. As to the fact that his abuse of his daughter varied from the abuse of his sons, the court concluded: "As we discussed previously in this opinion, the defendant engaged in multiple types of similar conduct with all three victims. The fact that the defendant was unclothed during his abuse of [his daughter] and engaged in additional types of sexual misconduct with her does not outweigh these numerous similarities or erode the probative value of that evidence.

"In addition, the fact that the defendant engaged in additional types of sexual misconduct with [his daughter] does not render his conduct with her so much more severe and shocking than his conduct with [his sons] that severance is required. As the trial court correctly noted, the allegations in all three cases were shocking, and the defendant's inappropriate touching and digital penetration of all three victims can only be characterized as severe. The fact that the defendant engaged in additional types of sexual misconduct with [his daughter] does not render the defendant's conduct toward [his sons] any less severe. Even if the conduct toward [the daughter] was significantly more egregious than his conduct toward [the sons], however, this court previously has upheld the admission of uncharged sexual misconduct when it differed in degree from the charged conduct." Id., 669.

Here, there were numerous similarities between the allegations of G and K, including: (1) the abuse began at a young, prepubescent age; (2) the abuse occurred when the defendant was alone with his children, or when other family members slept; (3) all of the abuse occurred in the family home; (4) on some occasions, the defendant would bring both G and K to his bedroom, lay them on the bed, and sexually abuse them; (5) the abuse involved the defendant touching G's and K's vaginas, performing oral sex on each of them, and touching their breasts with either his mouth or his hands; and (7) both G and K claimed that the abuse either drastically decreased or ceased when they began menstruating. As our Supreme Court concluded in *Devon D.*, we similarly conclude here that the fact that G claimed that the defendant began abusing her at a younger age and engaged in additional types of sexual misconduct with her does not outweigh the numerous similarities, nor does it render his misconduct with respect to G more severe and shocking than his misconduct with respect to K. Given the similarities between the conduct toward G and K, and in view of the standard of admissibility governing the use of prior misconduct evidence in sexual assault cases, we conclude that the trial court's conclusion that the alleged conduct of the defendant toward G and K was similar was proper.

Having determined that the evidence was relevant to prove that the defendant had a propensity to engage in aberrant sexual behavior, we turn to whether the probative value of the evidence outweighed its prejudicial effect. The defendant argues that because "both of the joined cases depended solely on the credibility of the witnesses and lacked any physical or other corroborating evidence," it was unduly prejudicial to join the cases because "the danger is great that the jury would have used the evidence cumulatively." We are not persuaded.

"We previously have held that the process of balancing probative value and prejudicial effect is critical to the determination of whether other crime[s] evidence is admissible. . . . At the same time, however, we . . . do not . . . requir[e] a trial court to use some talismanic phraseology in order to satisfy this balancing process. Rather . . . in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling. . . . In conducting this balancing test, the question before the trial court is not whether [the evidence] is damaging to the defendant but whether [the evidence] will improperly arouse the emotions of the jur[ors]." (Citation omitted; internal quotation marks omitted.) *State* v. *Devon D.*, supra, 321 Conn. 673.

We are satisfied that the trial court weighed the preju-

dicial effect of the evidence against its probative value before ruling on the cross admissibility of this evidence. After hearing argument from both parties, the court acknowledged in its memorandum of decision that evidence of child sex abuse was harmful to the defendant, but also noted that prior acts of similar sexual abuse of children are highly probative. "Although evidence of child sex abuse is undoubtedly harmful to the defendant, that is not the test of whether evidence is unduly prejudicial. Rather, evidence is excluded as unduly prejudicial when it tends to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue that justified its admission into evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Daniel W.*, supra, 180 Conn. App. 94–95. On appeal, the defendant does not explain how this evidence, if admitted as uncharged sexual misconduct at separate trials, would have been unduly prejudicial by showing more than his propensity to sexually assault his daughters. We note that "propensity is the precise purpose for which our legislature and courts have allowed such evidence to be admitted and considered." Id., 95. We conclude that the court correctly found that the prejudicial effect of the evidence did not outweigh its probative value, and that the evidence was cross admissible. Therefore, we need not consider whether the trial court properly applied the *Boscarino* factors.[21] See *State* v. *Devon D.*, supra, 321 Conn. 666 n.6.

In sum, we conclude that the trial court properly exercised its discretion in permitting the two cases against the defendant to be tried jointly. The defendant cannot demonstrate that he was substantially prejudiced by the joinder because the evidence in both cases would have been cross admissible to show that he had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct.

IV

The defendant finally claims that the trial court improperly denied his motion to allow him to make an opening statement to the jury. Although he acknowledges that Connecticut law does not guarantee counsel the right to make an opening statement, the defendant argues that "[d]enying the defendant's request prevented the defendant a fair opportunity to present his case." We are not persuaded.

The following procedural history is relevant to our resolution of this claim. On February 26, 2015, defense counsel Richard P. Silverstein filed a written motion requesting that the court permit him to give an opening statement. On the first day of trial, prior to the commencement of evidence, the court heard argument on this motion. The court stated its intention to allow counsel to introduce themselves to the jury, but "not get into any of the facts of the case." Defense counsel responded: "Well, I was hoping you'd let me go a little

further than that. What I would like to do, if there's no objection, was to indicate what I would do, you know, I didn't pick this jury, but in voir dire I cover a number of areas and that maybe cocounsel wouldn't have gone into. What I would like to be able to say to this jury is that the allegations themselves are poison, that the only thing worse than being a child molester is being accused of being a child molester, that I understand in cases such as this it is very difficult to afford the defendant the presumption of innocence. I know this. And it's also very hard to hold them to their burden of proof.

"And I want to explain to them that the burden of proof in a sexual assault case is the same burden of proof in [a] disorderly conduct case. I want to explain to them that probability is here and beyond a reasonable doubt is up here, and it's the—that what keeps criminal defense attorneys up at night is, we worry that the closer they come to reaching their burden, the harder it is for the jury to return a not guilty verdict, should they fall just short in reaching that burden, that they may be in the unenviable position of thinking my client is probably guilty, but are mandated by law, should they have a doubt based upon a reason found in the evidence or a lack of evidence, to acquit my client, and that they have taken an oath to do so; something like that."

The state responded that defense counsel's proposed opening statement was more akin to closing argument. The state also noted that many of the areas that defense counsel wanted to address in his opening statement already had been covered by his cocounsel, Attorney Samantha Kretzmer, during jury selection.

In an oral ruling, the court denied the defendant's motion to give an opening statement. The court noted that it planned to "give preliminary instructions to the jury before the evidence starts that touch upon certain of the items just referenced by counsel for the defendant," and that "much of the items just referenced by Mr. Silverstein were adequately covered by Attorney Kretzmer's more than thorough jury selection process," and that Attorney Silverstein had previously requested that the court permit him to conduct the evidentiary portion of the trial and Attorney Kretzmer the jury selection. The court stated that it would allow defense counsel and the state to introduce themselves to the jury, and that "all of the other items referenced by counsel can be addressed during closing argument."

After the jury entered the courtroom, the court informed it: "Before I go over some preliminary instructions, before the evidence starts, it's been a few weeks since you were all here, I'm going to have each attorney just briefly introduce themselves, so you know who the players are, again, and then I'll give you my brief instructions." After the state briefly addressed the jury, defense counsel addressed it as follows: "Good morning. I don't know any of you people. As you are aware,

I've been called down to try the case. My trial schedule prevented me from doing the voir dire, [as] I was on trial in New Haven. I usually like to get to know the people that are gonna sit on the case. In this case, it was impossible; however, I do appreciate you all showing up today, even though jurors were cancelled from what I understand.

"I'm from New Haven, Connecticut. I try cases all over the state. And I've been doing this for thirty years. It's all I do, is criminal defense work. I understand this is—this particular case is going to be difficult. You're gonna hear a lot of difficult testimony. It's the type of case that elicits an emotional response for most people. I would only ask you to maintain your objectivity, be dispassionate and objective when (indiscernible) the facts of this case. And I would just ask you to be fair and abide by your oath as a juror, which indicates that you will decide this case fairly and impartially, based solely on the facts that you find in this courtroom and the law the judge gives you. Toward that end, I look forward to working with you. Thank you."

In its preliminary instructions, the court instructed the jury, inter alia, as to the presumption of innocence, the state's burden of proof, and the jury's role in deciding the facts of the case and applying the law as provided by the court. Following these preliminary instructions, the evidentiary portion of the trial commenced.

We begin with the applicable standard of review and the principles of law that guide our analysis. In Connecticut, "the right to make an opening statement to the jury by a defendant in a criminal case is not guaranteed by law or rule. Whether to allow an opening statement is a decision to be left to the sound discretion of the trial court, taking into consideration the number and nature of the charges, the complexity of the issues, the number of defendants and their interrelationship, and similar factors which, when put into proper perspective by an opening statement, would serve to clarify the issues and focus the attention of the jury upon the matters it must decide." *State* v. *Ridley*, 7 Conn. App. 503, 506, 509 A.2d 546, cert. denied, 201 Conn. 803, 513 A.2d 698 (1986).

Under this standard, the court did not abuse its discretion when it denied the defendant's motion to make an opening statement. Defense counsel sought to address the jury, because he did not have the opportunity to do so during voir dire, about the nature of the allegations against the defendant, the difficulty in affording the presumption of innocence in "cases such as this," and the state's burden of proof. The court observed that cocounsel, Attorney Kretzmer, covered much of this material during jury selection, and further noted that Attorney Silverstein himself had requested that the court permit Attorney Kretzmer to conduct jury selection and Attorney Silverstein to conduct the

evidentiary portion of the trial. Furthermore, the court's statement that "all of the other items referenced by counsel" could be addressed during closing argument indicated its belief that defense counsel intended to offer argument more appropriate for closing arguments. It is well within the trial court's discretion to prohibit defense counsel from making legal argument in an opening statement. See *State* v. *Book*, 155 Conn. App. 560, 577, 109 A.3d 1027 (concluding that trial court acted well within discretion in limiting defense counsel's opening remarks because it anticipated that defense counsel would present jury with legal argument), cert. denied, 318 Conn. 901, 122 A.3d 632 (2015), cert. denied, U.S.     , 136 S. Ct. 2029, 195 L. Ed. 2d 219 (2016).

Furthermore, the defendant is unable to show that he was harmed by any claimed error. Although the court permitted counsel to introduce themselves to the jury, defense counsel in fact went beyond mere introduction and robustly addressed the jury regarding: (1) his inability to conduct voir dire in this case; (2) the nature of his practice; (3) the "difficult" testimony that the jury would hear during this case; and (4) the jury's duty to be objective and "decide this case fairly and impartially, based solely on the facts that you find in this courtroom and the law the judge gives you." In light of this statement, the court's observation that many of the topics that Attorney Silverstein wished to address were covered by cocounsel during voir dire, and the court's preliminary instructions to the jury, we conclude that the defendant was not deprived, in any meaningful way, from addressing the jury prior to the receipt of evidence. The court did not abuse its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crimes of sexual assault and risk of injury to a child, we decline to identify the victim or others through whom the identity of the victim may be ascertained. See General Statutes § 54-86e.

[1] The defendant's son from a previous relationship also moved to the United States at this time.

[2] Although K testified that the defendant began abusing her when she was five or six years old, both she and the mother testified that she was born in 1993. Since the family moved to Roosevelt Avenue in 2001, K must have been at least six or seven years old when the abuse began. We note this discrepancy, but conclude that it is immaterial to our disposition of the defendant's claims on appeal.

[3] Count six of the information charged that "at . . . Roosevelt Ave, Stamford, CT between the years of 2000 to 2004, [the defendant] engaged in sexual intercourse with a child under the age of 13 years, specifically [K], and the accused was more than two years older [than] said child . . . ."

[4] The court in *Albert* defined the labia majora as "the outer fatty folds bounding the vulva." (Internal quotation marks omitted.) *State* v. *Albert*, supra, 252 Conn. 798 n.5.

[5] In *State* v. *Scott*, 256 Conn. 517, 534, 779 A.2d 702 (2001), our Supreme Court again noted its conclusion in *Albert* that "a touching of the labium majora satisfies the penetration requirement . . . because penetration of the labia majora constitutes penetration of the body . . . ." (Internal quotation marks omitted.)

[6] The defendant cites two cases to support his assertion that the evidence before the jury was insufficient to convict him of sexual assault in the first degree. First, he cites *State* v. *Albert*, supra, 252 Conn. 798. The defendant

points to physical evidence in that case, specifically, scrapes on the inside fold of the victim's labia majora that easily bled when touched, and argues that "[t]he quantum of evidence in this case does not match that in *Albert*; there is only [K's] testimony that her recollection was that the defendant 'tried to' but was not successful in any type of digital penetration." The defendant also cites *State* v. *Merriam*, 264 Conn. 617, 621–22, 835 A.2d 895 (2003), in which our Supreme Court affirmed the judgment of conviction of sexual assault in the first degree, sexual assault in the second degree, and risk of injury to a child. The defendant again points to the physical evidence in that case, specifically, that an examination by the victim's pediatrician revealed redness of the victim's labia majora. Id., 628.

In essence, the defendant argues that because there was physical evidence to support the verdicts in those cases, and here, there only was the testimony of K, the evidence was insufficient to support his conviction of sexual assault in the first degree. We reject this argument. Physical evidence is not required to convict a defendant of sexual assault in the first degree. See, e.g., *State* v. *Pedro S.*, 87 Conn. App. 183, 201, 865 A.2d 1177 (concluding that there was sufficient evidence presented at trial to support defendant's conviction and noting that "[t]he defendant's claim is based solely on the flawed premise that the state bore the burden of proving its case with physical evidence"), cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005). Indeed, K's testimony alone, if credited by the jury, is sufficient to sustain the conviction. See *State* v. *Madore*, 96 Conn. App. 271, 283 n.12, 900 A.2d 64, cert. denied, 280 Conn. 907, 907 A.2d 93 (2006); see also *State* v. *Gene C.*, 140 Conn. App. 241, 247, 57 A.3d 885 ("[o]ur Supreme Court has recognized that a jury reasonably can find a defendant guilty of sexual assault on the basis of the victim's testimony alone"), cert. denied, 308 Conn. 928, 64 A.3d 120 (2013).

[7] For the first time, on appeal, the defendant also claims that the trial court erred in admitting, through the testimony of G and K, evidence of uncharged sexual misconduct. Although the defendant argues that "[t]rial counsel's motions, arguments and the court's rulings have preserved this claim for review," our review of the record reveals that defense counsel never objected to the admission of this evidence. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Jose G.*, 102 Conn. App. 748, 755–56, 929 A.2d 324 (2007), aff'd, 290 Conn. 331, 963 A.2d 42 (2009). The defendant's claim as to the uncharged sexual misconduct evidence, therefore, is unpreserved for appeal, and the defendant has not requested review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), or requested reversal pursuant to the plain error doctrine. See Practice Book § 60-5; see also *State* v. *Jose G.*, supra, 756 ("[w]here a defendant fails to seek review of an unpreserved claim under either *Golding* or the plain error doctrine, this court will not examine such a claim" [internal quotation marks omitted.]). Accordingly, we decline to review this claim.

[8] Although, in its motion, the state cited to § 4-5 (b) of the Connecticut Code of Evidence, § 4-5 (c) contains the exception to which the state was referring.

[9] At the January 15 hearing, the state represented that G and K would testify that they observed the defendant be physically violent toward their mother on a regular basis, and that they were fearful of what the defendant would do to them and their mother. The state further represented that the mother would testify that the defendant was physically abusive throughout their marriage and that she sought medical treatment at least once, but the defendant intimidated her into not saying "what actually happened to her." The state explained that this evidence was needed to help the jury understand the atmosphere in the home, the intimidation that was going on in the home, the power and control that the defendant had over the family, the fear that the children would feel about reporting the sexual abuse, and why G and K would not go to the mother for protection, because she "was not even able to protect herself." The state argued that delayed disclosure was an

important issue in this case, that this evidence would help the jury understand G and K's delayed disclosures, and that this evidence would corroborate crucial prosecution testimony about the witnesses' reasons for their late disclosures. The state acknowledged that if the court permitted this testimony, it could also give a limiting instruction to the jury that would minimize any prejudicial effect.

In response, the defendant argued that this evidence was prejudicial and uncorroborated, and that, if the jury was permitted to hear this evidence, it would "assume this guy is a wife beater" and consequently think that "he probably is guilty of these sexual assaults as well." The defense further argued that the delayed reporting was unrelated to the alleged domestic abuse because it was too far removed in time from the 2012 reporting dates. Defense counsel did concede, however, that she intended to cross-examine G and K on the issue of delayed disclosure, but maintained that it should not "be brought up that they [reported] it later because they saw their father beating on their mother," and that she did not think "that has anything to do with this delayed disclosure."

[10] Defense counsel responded: "Well, I hope it doesn't—open the door to that type of evidence, Your Honor, because, as I said, it—it very well could be that had they come forward a year later, a year after he left the house, and they were still at a tender age of eight, nine, ten, eleven years old, we're talking about grown women now. They're no longer in fear of him. This mother has moved on. He got remarried. He lives in Boston. They haven't seen him for five years. So, the idea that they're still in fear of him and that's why the late disclosure, well, that would be fine if the late disclosure was a year after he left—left the house. But five years, five years after he's led the—left the house and they've had no contact with him, they're claiming that they're still in imminent fear of him and what he would do to their mother and use that to describe why this late disclosure occurred as it did? That dog don't hunt."

[11] In *State* v. *Cruz*, supra, 56 Conn. App. 764, a jury found the defendant guilty of five counts of sexual assault in the first degree and two counts of risk of injury to a child. On appeal, the defendant claimed that the trial court erred in allowing the victim to testify that she did not report the sexual abuse for more than two years because she feared the defendant because she believed him to be a gang member. Id., 771. This court concluded that "[t]his evidence was relevant to aid the trier to determine why [the victim] had waited two years before reporting the crimes, an issue directly involving [the victim's] credibility," and affirmed the judgments of conviction. Id., 771–72.

[12] In *State* v. *Daniels*, supra, 42 Conn. App. 446–47, a jury found the defendant guilty of one count each of sexual assault in the first degree, assault in the third degree, and unlawful restraint in the first degree. On appeal, the defendant claimed that the trial court erred in allowing the victim to testify about past incidents of sexual abuse. Id., 449–50. Specifically, the victim testified that she was twice sexually assaulted in the past by other men, and that on both occasions, nothing was done after she reported those incidents. Id., 450. Because of this, she was reluctant to report the sexual assault by the defendant and delayed in reporting. Id. This court concluded that "the proffered testimony clearly had a tendency to aid the jury in its determination as to why she delayed before reporting the incident to the police"; id., 451; and affirmed the judgment of conviction. Id., 460.

[13] The court instructed: "So, ladies and gentlemen, it's my job now to give you another instruction. You just heard the witness testify about being struck, allegedly, by the defendant. I must instruct you that this evidence may be used by you, if you decide to use it at all, for one purpose and one purpose only; that is, to assess the credibility of the alleged victim's testimony on the issue of the alleged sexual assaults only. It can be used for no other purpose, including as substantive evidence that the defendant is guilty of the crimes charged. Rather, it may only be used to assess the credibility of the alleged victim's testimony. But you cannot use that evidence that the defendant allegedly struck this witness in determining that the defendant is guilty of the crimes charged. Again, it's only related to the credibility of the witness."

[14] The court instructed: "I'm going to interrupt one moment and give one more instruction on this last piece about the witness' alleged observations of swelling on her mother's face and her allegedly hearing the arguments between her mother and father. Just like I just mentioned a few moments ago, this evidence is being offered to explain the alleged failure to report in a timely manner. And I must instruct you that this evidence may be used,

again, if you decide to use it at all, for one purpose and one purpose only, namely, to assess the credibility of the alleged victim's testimony. It can be used for no other purpose, including as substantive evidence that the defendant is guilty of the crimes charged in the information. Rather, it may only be used to assess the credibility of the alleged victim's testimony."

[15] The court instructed: "Ladies and gentlemen of the jury, the instruction I gave you before about the use of the alleged domestic violence type evidence is solely for the purpose of credibility, also applies to the testimony you just heard from the witness about allegedly observing her sister being struck by her father. Same type of instruction; that evidence is solely to assess the credibility of the alleged victim's testimony, particularly on the issue of when it was reported, the sexual assaults were reported. And it can't be used for any other purpose, including as substantive evidence that the defendant is guilty of the crimes charged in the information. It's only to be used to assess the credibility of the alleged victim's testimony on the issue of when she reported these alleged sexual assaults."

[16] The court instructed: "All right. Before we proceed with the cross-examination, I'm going to tell the jury one other cautionary instruction. You just heard the testimony from this witness about alleged—her being allegedly physically struck by the defendant, as well as the testimony regarding her older sister's allegedly being physically struck by the defendant. I must instruct you, as I think I did earlier during the testimony of the first witness, that this evidence of the defendant's alleged behavior as just described may be used by you, if at—if you decide to use it at all—for one purpose and one purpose only, namely, to assess [the] credibility of the testimony from this witness. It can be used for no other purpose, including as substantive evidence that the defendant is guilty of the crimes charged.

"The defendant is not charged with any of the physical abuse type evidence you just heard. And the testimony from this witness may be used only to assess the credibility of this witness' testimony and not as substantive evidence that the defendant is guilty of the crimes charged in the information."

[17] The court instructed: "I'm just going to tell the jury; I know you might be getting tired of me, hearing this, but what you just heard about this alleged injury that this witness suffered, as I said before, you can use that for one purpose and one purpose only. And that's only to assess the credibility of the alleged victims on the issue of why they delayed to report the incident.

"You can't use it for any other purpose. So, for example, you can't, if you believe this testimony, you can't say, well, I believe that this witness was injured, and, therefore, the defendant must be guilty of the crimes charged in the information. That you can't do. But you can use this to assess the credibility of the alleged victims as to the issue of why they delayed in their report."

[18] "Relevant evidence" means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Conn. Code Evid. § 4-1.

[19] The defendant also argues that evidence of his violence toward the mother and children was irrelevant to the issue of delayed disclosure. Specifically, he argues that, in light of the facts that he moved out of the family home in 2007 and subsequently moved to another state, eventually divorced from the mother, and maintained very little contact with G and K, "[t]here was no evidence that they were in [a] situation or [in] circumstances that the defendant could harm them or their mother since 2007." We conclude that the trial court was correct in its determination that such an argument goes to the weight of the evidence, not its admissibility. Furthermore, having suffered through the years of abuse that they alleged occurred at the hands of the defendant, it was not unreasonable that G and K would fear for their safety and the safety of their mother years after the abuse had ceased.

[20] The entirety of the court's instruction was as follows: "Multiple charges and/or informations. The defendant is charged with ten counts. To the extent that there have been any changes regarding the content of the information, it is of no concern to your deliberations. You are to consider only the specific charges submitted to you and not concern yourself with how the information may have read when it was read to you at the start of trial.

"The defendant is entitled to and must be given by you a separate and independent determination of whether he is guilty or not guilty as to each of the counts. Each of the counts charged is a separate crime. The state is required to prove each element in each count beyond a reasonable doubt. Each count must be deliberated upon separately. The total number of counts

charged does not add to the strength of the state's case. You may find that some evidence applies to more than one count of the information. The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity. You must consider each count separately and return a separate verdict for each count. This means that you may reach opposite verdicts on different counts. A decision on one count does not bind your decision on another count."

[21] We also note that, even if we were to assume arguendo that the joinder of the informations resulted in prejudice to the defendant, we would conclude that the court's repeated and detailed jury instructions cured any prejudice. First, after the jury was impaneled and sworn in, the court instructed the jury that the charges set forth in the information were to be considered as separate counts. Second, during trial, the court again emphasized that the jury was required to "independently evaluate each and every [count] of the information," and make independent determinations of guilt or innocence on each count. Third, the court reiterated these instructions during its final charge. "It is well established that [t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Davis*, 98 Conn. App. 608, 624, 911 A.2d 753 (2006), aff'd, 286 Conn. 17, 942 A.2d 373 (2008), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 549, 34 A.3d 370 (2012).

Nonetheless, the defendant argues that "[a]lthough the defendant was acquitted of the allegations brought by [G], that doesn't necessarily resolve whether the defendant was prejudiced by the joinder," and cites our Supreme Court's decision in *Boscarino* for the proposition that "[a]cquittal of some charges doesn't necessarily guarantee that the jury considered the evidence in each case separately." We are not persuaded.

In *Davis*, the defendant was charged with crimes relating to three separate incidents in three informations. *State* v. *Davis*, supra, 98 Conn. App. 611. Those informations were joined for trial. Id. The jury returned verdicts of guilty on all charges related to two of those incidents, but a verdict of not guilty on all charges related to the third incident. Id., 624–25. This court affirmed the judgments of conviction, and on appeal, our Supreme Court noted that "by acquitting the defendant of all of the offenses charged in [one] case, the jury evidently was able to keep the three cases separate and did not blindly condemn the defendant on the basis of the evidence adduced in the [other] case." *State* v. *Davis*, 286 Conn. 17, 37, 942 A.2d 373 (2008), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 549, 34 A.3d 370 (2012). Here, the jury returned verdicts of not guilty on all charges related to the allegations made by G, and of guilty on all charges related to the allegations made by K. We conclude that acquittal of the charges related to G's allegations demonstrates that the jury properly considered each information separately. See also *State* v. *Rodriguez*, 91 Conn. App. 112, 120–21, 881 A.2d 371 (acquittal of one of eight counts charged demonstrated that jury was able to consider each count separately), cert. denied, 276 Conn. 909, 886 A.2d 423 (2005).