******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DANIEL M.*
(AC 44355)

Alvord, Cradle and Lavine, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the fourth degree and risk of injury to a child, the defendant appealed to this court. At trial, the trial court admitted the testimony of the victim, W, and W's mother, that the defendant physically abused W's mother. The state offered this testimony to explain W's alleged delayed disclosure of sexual abuse by the defendant when she was a minor. On appeal, the defendant claimed that the court erred in admitting the allegations of domestic violence as evidence of uncharged prior misconduct. *Held* that the defendant could not prevail on his claim that the trial court abused its discretion in admitting the uncharged misconduct evidence because it incorrectly determined that the probative value of that evidence was not substantially outweighed by its prejudicial effect: the evidence was relevant because, when assessed in light of the expert testimony offered at trial regarding domestic violence as a reason a victim may delay disclosure of abuse, it was probative of W's credibility, as it provided an explanation as to why she delayed in disclosing the sexual abuse against her, although the defendant did not hit W or threaten her with violence, W testified that she observed the violence between the defendant and her mother, which occurred on a near weekly basis, and it scared her; moreover, the probative value of the challenged testimony was not outweighed by its prejudicial effect, as the evidence of domestic violence between the defendant and W's mother was less extreme and therefore less prejudicial than the uncharged domestic violence evidence considered by this court in *State* v. *Gerald A.* (183 Conn. App. 82), and it did not tend to unnecessarily arouse the jurors' emotions, especially in light of the nature of the crimes with which the defendant had been charged, namely, sexual abuse of a child, did not create a distracting side issue as it pertained to the credibility of the state's key witnesses, and presentation of the evidence did not consume an inordinate amount of time during the trial; furthermore, the fact that the court provided a contemporaneous, limiting instruction during the testimony about the domestic violence, as well as a limiting instruction in its final charge to the jury, reduced any prejudicial impact the evidence might have had.

Argued January 3—officially released March 1, 2022

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, and tried to the jury before *Blawie, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (defendant).

*Sydney Geer*, certified legal intern, with whom were *Matthew A. Weiner*, assistant state's attorney, and, on the brief, *Paul J. Ferencek*, state's attorney, *Daniel Cummings*, assistant state's attorney, *Elizabeth K. Moran*, assistant state's attorney, and *Jennifer F. Miller*, former assistant state's attorney, for the appel-

lee (state).

*Opinion*

ALVORD, J. The defendant, Daniel M., appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2)[1] and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[2] On appeal, the defendant claims that the trial court erred in admitting evidence of uncharged prior misconduct. We disagree and, therefore, affirm the judgment of conviction.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. In or about 2007,[3] the defendant met M. R., the victim's mother, at a party. Although the defendant was married with children, M. R. and the defendant began a sexual relationship.[4] Early in their relationship, M. R. became pregnant with the defendant's daughter, M. At around the same time, M. R. traveled to the Philippines, in order to move her daughter, W, who was born in 2002 and was five or six at the time of the move, to the United States.[5]

Initially, the family, which included W, M. R., W's grandmother, and W's half-sister M, lived in a very small apartment in Norwalk. Because W's grandmother did not like the defendant, he would "sneak in" to the apartment at night to be with M. R. When W was in fifth grade, the family moved to an apartment in Stamford. At this point, the defendant began to spend more time in the apartment and no longer covertly arrived at night.

While the family lived in Stamford, when W was twelve or thirteen years old, the defendant began sexually abusing W. "It started with little subtle things" at first, and W became "uncomfortable physically" around the defendant. "During car rides, [the defendant] would place his hand on [W's] upper inner thigh and force [her] to hold his hand."[6] This would happen every time the defendant gave her a ride. The defendant would also "hug [W] from behind and press himself against [her]." "The feeling of him" made her uncomfortable because she testified: "I would just feel that he was aroused behind me."

Additionally, on weekends when her mother and grandmother were at work and W was still in bed,[7] the defendant would climb up to her top bunk, get in the bed, hug her from behind, and touch her breasts. As he "cuddle[d]" her, she would "feel that he was aroused." In an attempt to make him stop, W would tell the defendant that he was going to break the bunk bed, but he would reply that it was fine. W testified that when the defendant would do this "[it] felt like my whole body went numb. I—even if I could try to scream for help my mouth wouldn't open."

On one occasion, in or around the summer of 2016, the defendant was at the apartment with W and M—

M. R. and W's grandmother were at work—watching television in the living room. The family kept a mattress in the living room, which they would pull out in front of the couch when watching television. On this evening, M was on the couch and W and the defendant were laying on the pullout mattress (pullout mattress). While watching television, after checking to see that M was not looking, the defendant pulled a blanket over himself and W and moved closer to W. He then put his hand under W's shirt and "grop[ed]" her breasts, commenting that "[they] were coming in nicely" and were "a nice shape." He then "placed his hand under [W's] pants and underwear and touched [her] vagina" and whispered to her "that it was his." The defendant then forced W to touch his erect penis and told her to "shake it." W then pretended to fall asleep, and the defendant left the room.

Another incident occurred around the same date. W was sitting on the pullout mattress watching television when the defendant came into the room and laid down on the couch. He then asked W if she could keep a secret, grabbed W's hand, forced her to touch his erect penis, and asked her how it felt. W did not respond and pretended to fall asleep, at which point the defendant left. Although the defendant continued to touch W's leg and hold her hand during car rides, no subsequent incidents of sexual abuse occurred.

At around this time, M. R. noticed a change in W's behavior when she was around the defendant. M. R. testified about two incidents when W began to cry for no clear reason. One night, when out to dinner with the defendant and M, W began to cry and would not tell M. R. what she was upset about. Later, on a trip to New York City, the family was taking a ferry to see the Statue of Liberty and W started crying and again told her mother that she did not want to talk about what was wrong. M. R. expressed concern to the defendant, who responded, "she's fine, she's just like jealous that we're together with [M]. And she just want[s] attention."

In late September, 2016, W told her mother about the defendant's abuse.[8] M. R. immediately called the defendant and told him to come to the apartment right away. When he arrived, M. R. told the defendant that W had told her that he had "touch[ed] her private part."[9] Initially, the defendant claimed that W was lying because she "didn't want him around anymore." [10] He eventually admitted to touching W and claimed that he did it because he wanted to break up with M. R. He later told M. R. that he did it because he wanted to get close to W and said that "if he and [W] had like sexual thing . . . she will feel comfortable around him." M. R. did not tell anyone about the abuse.[11] The defendant did not cease living in the apartment.[12]

In November, 2016, the family moved to Greenwich, and the defendant began to spend even more time living

with the family. In early 2017, W told her aunt about the abuse and her aunt encouraged her to tell someone at school.[13] W then told her school's social worker, who reported the abuse to the Stamford Police Department. Following the police investigation, the defendant was arrested.

Prior to trial, on July 15, 2019, the state filed a notice of its intent to present evidence of uncharged misconduct pursuant to § 4-5 (c) of the Connecticut Code of Evidence.[14] Specifically, the state notified the defendant that it intended to present evidence "of the defendant's acts of domestic violence toward the mother of the victim at times prior to the victim reporting the events from which the current case arises." The state asserted that "[t]his evidence is relevant to corroborate crucial prosecution testimony, to complete the story, and to explain any alleged delay in disclosure of sexual abuse."

The defendant filed a written objection to the uncharged misconduct evidence, arguing that "[t]he probative value of such evidence is outweighed by its prejudicial value" and that "the evidence would also prolong the trial as evidence may be introduce[d] to counter the allegation of domestic violence."

On September 9, 2019, a hearing was held before the court, *Blawie, J.* The state argued that the uncharged misconduct evidence would "corroborate crucial prosecution testimony, and [would] explain any delayed disclosure." The state relied on *State* v. *Gerald A.*, 183 Conn. App. 82, 106–10, 191 A.3d 1003 (concluding that court did not abuse its discretion in admitting evidence of domestic violence as uncharged misconduct evidence in child sex abuse case as explanation for delayed disclosure of abuse), cert. denied, 330 Conn. 914, 193 A.3d 1210 (2018), for the proposition that evidence of domestic violence can show that W "had reason to fear the defendant because he would regularly commit acts of violence in front of her against her mother causing injuries to her mother, and that explains in part why she did not make an immediate disclosure when the alleged abuse occurred." Defense counsel objected to the uncharged misconduct, arguing that the evidence was more prejudicial than probative. Defense counsel acknowledged, however, that *Gerald A.* "seem[ed] to be on point."

The court then made the following oral ruling: "I think it is pretty much on point. I understand that there's also maybe some statements made by either the complaining witness or a family member that would undermine the allegations. And again it may be irrelevant on multiple points.

"But I think that I will await the evidence, but I'm inclined to allow it if there's an adequate foundation. If I do allow it, I intend on using language similar, if not identical, to the limiting instruction offered by the

trial court in *State* v. *Gerald A.* . . .

"So again, I'm not necessarily granting the motion. I am going to ask you to excuse—that the jury be excused at the time you intend to proffer it, and then I will make a ruling on the basis of the record as it exists at that time. . . .

"All right. If there's an adequate foundation, I'm inclined to allow it, but I'll have to await the evidence."

On September 11, 2019, the first day of evidence, the state called W as a witness. W testified that the defendant and her mother would get into fights that often turned physical.[15] She testified that the defendant "would grab [M. R.] by the hair, grab her by the arm and twist her arm . . . pull her hair, choke her." W testified that this violence scared her and was the reason she "never liked" the defendant. Following this testimony, the court gave a limiting instruction.[16] W then testified that she had observed bruises on her mother's arms and stomach as a result of the violence. W also testified that once, when she was twelve years old, she yelled at the defendant to stop hitting her mother, and he "grabbed [W] and raised his voice . . . and started yelling . . . ."

The state also called M. R. during its case-in-chief. M. R. testified that she and the defendant fought every week, that the fights sometimes became physical, and that the defendant would grab her, pull her hair, and choke her.[17] She also testified that W and M had witnessed these verbal fights become physical. The court then provided a limiting instruction.[18]

The state also presented the testimony of Lynn Nichols, the director of victim's services at the Women's Center of Greater Danbury and a forensic interviewer. Nichols testified that domestic violence can be a reason for delayed disclosure of abuse and that a victim could "fear that another family member might get hurt" if they were to disclose the abuse. In addition, when asked by the prosecutor, Nichols agreed that "if . . . the person's primary caregiver was a victim of violence by the abuser" it could "affect their willingness to come forward."

After the close of evidence, the court instructed the jury with respect to this evidence as follows: "Now, you will recall that I told you at the start of this trial that some testimony may be admitted for a limited purpose. Any testimony which I've identified as being limited to a purpose must be considered by the jury only as it relates to the limits for which it was allowed. And you should not consider such testimony in finding any other facts as to any other issue.

"In this case the state has offered evidence through both the complainant, [W], and the complainant's mother, [M. R.], about the defendant's alleged acts of domestic violence with [M. R.]. This evidence was not

admitted to prove the bad character, propensity, or criminal tendency of the defendant. Such evidence was admitted solely in an attempt to show or to establish a possible reason why the complainant may have delayed reporting the allegations of sexual assault. However, you may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and if you further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state but only as it may bear on the issues of a possible delay in reporting.

"On the other hand, if you do not believe such evidence or even if you do if you find that it does not logically, rationally, and conclusively support the issues for which it was offered by the state, then you may not consider that testimony for any purpose. Otherwise it may predispose your mind uncritically to believe that the defendant [may be] guilty of the offenses charged merely because of alleged acts of domestic violence. For this reason, you may consider the evidence only on the issues of a possible reason for a delayed reporting by [W] and for no other purposes."

The jury found the defendant guilty of all four counts: two counts of sexual assault in the fourth degree in violation of § 53a-73a (a) (2) and two counts of risk of injury to a child in violation of § 53-21 (a) (2). The court sentenced the defendant to a total effective term of twenty years of incarceration suspended after eight years followed by twenty years of probation. In addition, the court entered a standing protective order with respect to W and M. R. and ordered lifetime registration as a sex offender. This appeal followed.

On appeal, the defendant claims that the trial court improperly admitted evidence of uncharged misconduct in the form of the testimony of M. R. and W that the defendant physically abused M. R. Specifically, the defendant asserts that "[t]he trial court incorrectly determined that the probative value of this evidence was not substantially outweighed by its prejudicial effect." We are not persuaded.

We begin by setting forth the applicable standard of review and legal principles that guide our analysis. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . .

"As a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be

relevant and material to at least one of the circumstances encompassed by the exceptions.[19] Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Gerald A.*, supra, 183 Conn. App. 106.

We first address the relevance of the challenged evidence. The defendant argues that the evidence had "little to no" probative value for the purposes of the balancing test, suggesting that "[o]vercoming the probative value of this evidence with undue prejudice would be easier than ripping through a wet paper bag." In making this argument, the defendant attempts to distinguish *State* v. *Gerald A.*, supra, 183 Conn. App. 82, by comparing the nature of the domestic violence evidence in that case to the domestic violence evidence in the present case.

In *Gerald A.*, this court addressed the use of domestic violence as uncharged misconduct evidence in child sexual abuse cases and determined that the "uncharged misconduct evidence provided an explanation for why [the children] delayed in disclosing the sexual abuse and, therefore, the court was correct in its determination that it was relevant because it bore on the important issue of their credibility as witnesses." Id., 108.

The defendant points out that the domestic violence in *Gerald A.* included violence against the victim of the sexual abuse, was long-standing, and involved threats of violence against the victim if she were to disclose the abuse. Therefore, because the defendant in this case did not threaten W, he never hit W, and the violence was not as "long-standing,"[20] the defendant argues that "the entire issue of domestic violence did not shed any light on whether [W] was credible or whether there was a legitimate reason for her delayed disclosure." We disagree. Assessed in light of the expert testimony regarding delayed disclosure, that the defendant did not hit W or threaten her with violence does not diminish the fact that W observed the violence between the defendant and her mother and it scared her. The evidence of the domestic violence between the defendant and M. R., which occurred on a near weekly basis, is probative of W's credibility as it provided an explanation as to why W delayed in disclosing the sexual abuse.[21] See *State* v. *Gerald A.*, supra, 183 Conn. App. 108. Therefore, we disagree with the defendant's contention that the evidence had "little to no" probative value.

We next turn to whether the probative value of the prior misconduct evidence outweighed its prejudicial

effect. See id., 106. "Section 4-3 of the Connecticut Code of Evidence . . . provides that [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. [T]he determination of whether the prejudicial impact of evidence outweighs it probative value is left to the sound discretion of the trial court judge and is subject to reversal only where an abuse of discretion is manifest or injustice appears to have been done. . . . [Our Supreme Court] has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) Id., 108–109.

The defendant argues that the evidence was "dangerously prejudicial" because it unnecessarily aroused the jurors' emotions and created a secondary issue that became "a side show." Therefore, he asserts that "[g]iven the evidence's scant probative value, this prejudicial impact outweighed its probative value and the trial court erred in granting the state's motion to admit it into evidence." The state contends that the probative value of the evidence outweighed any prejudicial effect, especially in light of the nature of the case and the court's limiting instructions.[22] We agree with the state.

We conclude that the court did not abuse its discretion in determining that the probative value of the challenged testimony was not outweighed by its prejudicial effect. At the outset, we note that this court previously considered uncharged misconduct evidence in *State* v. *Gerald A.*, supra, 183 Conn. App. 109, and concluded that the trial court properly determined that the probative value of the evidence outweighed its prejudicial effect. In that case, the state presented evidence of the defendant hitting his children with a belt on multiple occasions, hitting their mother in front of them, and threatening them with violence if they disclosed the sexual abuse as relevant to why the two children delayed reporting the sexual abuse that they suffered at the hands of their father. Id., 101–104. Because the uncharged misconduct evidence was dissimilar from the charged crimes, went to the essence of the state's case (i.e., the credibility of the victim-witnesses), and did not consume an inordinate amount of time at trial, this court concluded that the trial court did not abuse its discretion in admitting the evidence. Id., 109–10. Here, as the defendant points out, the evidence of domestic violence is less extreme and, therefore, less

prejudicial, than the domestic violence evidence in *Gerald A.*, supporting our conclusion that the uncharged misconduct evidence was properly admitted in this case.

Furthermore, the uncharged misconduct evidence did not tend to unnecessarily arouse the jurors' emotions, especially in light of the nature of the crimes with which the defendant had been charged, namely sexual abuse of a child. See id., 109; see also *State* v. *Vega*, 259 Conn. 374, 398, 788 A.2d 1221 ("evidence of dissimilar acts is less likely to be prejudicial than evidence of similar or identical acts" (internal quotation marks omitted)), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

Moreover, despite the defendant's assertions to the contrary, the evidence did not create a distracting side issue as it "pertained to the credibility of the state's key witness[es], which was the essence of the state's case." *State* v. *Estrella J.C.*, 169 Conn. App. 56, 99–100, 148 A.3d 594 (2016). Additionally, presentation of the uncharged misconduct evidence and counterproof of it did not consume an inordinate amount of time during the trial.[23] Therefore, the court did not abuse its discretion in admitting the uncharged misconduct evidence.

Finally, the fact that the court provided a contemporaneous limiting instruction during both W's and M. R.'s testimony about the domestic violence, as well as in its final charge to the jury, reduced any prejudicial impact the evidence might have had.[24] See *State* v. *Gonzalez*, 167 Conn. App. 298, 310, 142 A.3d 1227 ("[w]here . . . [t]he court also [gives] a limiting instruction immediately, the prejudicial impact is lessened and the evidence is more likely admissible" (internal quotation marks omitted)), cert. denied, 323 Conn. 929, 149 A.3d 500 (2016); see also *State* v. *Pereira*, 113 Conn. App. 705, 715, 967 A.2d 121 ("Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.)), cert. denied, 292 Conn. 909, 973 A.2d 106 (2009).

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained.

[1] General Statutes § 53a-73a (a) (2) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . such person subjects another person to sexual contact without such other person's consent . . . ."

[2] General Statutes § 53-21 (a) (2) (B) provides in relevant part: "Any person who . . . has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

General Statutes § 53a-65 (8) defines "[i]ntimate parts" as "the genital area or any substance emitted therefrom, groin, anus or any substance emitted therefrom, inner thighs, buttocks or breasts."

[3] The defendant testified that he met M. R. in 2009. The testimony of W and M, however, coupled with the defendant's testimony, establishes that they met in 2007. Given that W arrived in the United States when she was five or six years old and was born in 2002, and because her arrival coincided with the start of the defendant's relationship with M. R., the two must have met in 2007 or 2008, at the latest. We note this discrepancy but conclude that it is immaterial to our disposition of the defendant's claim on appeal.

[4] Shortly after the defendant began the relationship with M. R., his wife discovered the affair. The defendant then made no effort to hide that he has dividing his time between the two women and their children. The marriage continued until 2013. The defendant's sexual relationship with his wife continued after the dissolution of their marriage.

[5] The defendant was unaware of W's existence until M. R. left to pick up W from the Philippines.

[6] The defendant testified that W used to sit in the back seat of the car whenever he gave her a ride, but she moved to the front when he encouraged her to sit closer to him.

[7] Due to the small size of the apartment, the living room also functioned as W's bedroom. W shared a bunk bed with her half sister, M.

[8] M. R. testified that W told her that she no longer wanted the defendant in the house because he had been touching "her private part."

[9] The defendant testified that he assumed that M. R. had discovered his relationship with a third woman and that was why she had called him to the apartment.

[10] Even as late as the investigation into the defendant's conduct, the defendant maintained that W was lying and told M. R. that she should send W back to the Philippines.

[11] After the confrontation, M. R. took W shopping with her grandmother. M. R. said nothing about the abuse. W understood this as meaning the information should be kept between the two of them.

[12] In fact, the defendant only stopped living in the apartment when he was arrested in July, 2017.

[13] W testified that an incident that occurred on New Year's Eve of 2016 impacted her decision to tell her aunt about the abuse: "We were coming home from a New Year's Eve party . . . . [The defendant] was drunk but he insisted that he was going to drive. The house [we were leaving] was all the way on top of a hill. And when he was pulling out of the driveway, he sped all the way down the hill and we almost crashed into the tree." The defendant and M. R. then got into a "huge fight" which became verbal and physical.

Although W testified that she told her aunt about the abuse in December, 2016, given this testimony about the New Year's Eve incident, she likely spoke to her aunt in January, 2017, and not December, 2016. We note this discrepancy but conclude that it is immaterial to our disposition of the defendant's claim on appeal.

[14] Section 4-5 (c) of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

[15] W also testified that many of these fights were provoked by the fact that the defendant continued to have a sexual relationship with his wife (later ex-wife) and M. R. She also testified that M. R., and not the defendant, was sometimes the initial aggressor.

[16] The court instructed the jury as follows: "[T]he evidence that you're hearing, I must instruct you, that evidence is to be used by you if you decide

to use it at all, for one purpose. And that is to assess the credibility of this witness' testimony.

"It cannot be used for any other purpose, including as substantive evidence that the defendant is guilty or not guilty of the crimes charged in this case. It only may be used to assess the credibility of this witness.

"And you cannot use that evidence that the defendant allegedly attacked the witness' mother in determining whether the defendant is guilty or not guilty of the crimes charged in this case. I will give you more instructions on this in a moment.

"But understand that this evidence is offered for a limited purpose."

[17] M. R. testified that she and the defendant fought over the situation with his other family and her jealousy. She also testified that sometimes she was the one who became violent and would "scratch" the defendant.

[18] The court instructed: "[T]his evidence is being offered for a limited purpose and I will explain that to you more fully in my final instructions. But recall, the defendant's not on trial for domestic violence. All right."

[19] "Under the first prong of the test, the evidence must be relevant for a purpose other than showing the defendant's bad character or criminal tendencies. . . . Recognized exceptions to this rule have permitted the introduction of prior misconduct evidence to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Footnote omitted; internal quotation marks omitted.) *State* v. *Gerald A.*, supra, 183 Conn. App. 106–107.

[20] We note that M. R. testified that she fought with the defendant every week and that the relationship between M. R. and the defendant lasted "[a]bout nine years."

[21] "Issues of credibility typically are determinative in child sexual abuse prosecutions. This is so because in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses." (Internal quotation marks omitted.) *State* v. *Estrella J.C.*, 169 Conn. App. 56, 98, 148 A.3d 594 (2016); see also footnote 19 of this opinion.

[22] The state also argues that that the defendant's claim is not preserved because "the trial court expressly deferred its ruling on the admissibility of the uncharged misconduct evidence until the state presented such evidence" and the defendant was required to object to the evidence when it was presented at trial in order to preserve the claim of evidentiary error. Thus, the state asserts that the defendant's claim is unreviewable for lack of a final ruling. The defendant, however, argues that the court's "ruling was unambiguous that the evidence was coming in subject to the state's ability to lay foundation" and that because he objected and the objection was overruled, he "had no further role in this procedure."

Here, the defendant objected to the evidence and the court held a hearing, ruled that, barring a lack of foundation, the evidence was admissible, noted that it would provide a limiting instruction along with the evidence, and provided such a limiting instruction. Further, we agree with the defendant's assertion in his reply brief that the cases on which the state relies fail to support its contention that the defendant's claim is not preserved. Therefore, we conclude that the defendant's claim is reviewable.

[23] Further, there was no surprise because the state notified the defendant of its intent to present this evidence and court held a hearing and gave the defendant the opportunity to be heard on the issue. See *State* v. *Gerald A.*, supra, 183 Conn. App. 109–10.

[24] The defendant asks us to disregard our long-standing rule that a jury is presumed to have followed a court's limiting instruction. The defendant argues that "[s]omewhere, in sorting out these salacious details and watching this drama play out in the courtroom, the jury was supposed to limit their consideration of evidence of domestic violence to explain why [W] should be believed and why she delayed her disclosure. That would have been next to impossible. The jury was put on a street corner at the time of a car crash and told to look away. The jury's task was beyond the limits of human nature, they could not have been expected not to be offended by this evidence." According to the defendant, the "noxious cocktail of the facts of the case" was "too much for the jury to bear." As the state correctly points out in its brief to this court, however, "[t]hat argument finds no support in either the law or the record." See *State* v. *Pereira*, 113 Conn. App. 705, 715, 967 A.2d 121, cert. denied, 292 Conn. 909, 973 A.2d 106 (2009). Consequently, we reject it.